MIDWEST JANITORIAL SUPPLY CORP., Craig Hotchkiss, Bruce Hotchkiss, and Steve Hotchkiss, Appellants,

v.

David GREENWOOD and Greenwood Cleaning Systems, Appellees.

No. 98–2031.

Supreme Court of Iowa.

July 5, 2001.

Patrick M. Roby and Christopher L. Bruns of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellants.

Martha L. Shaff of Betty, Neuman & McMahon, L.L.P., Davenport, for appellee David Greenwood.

Thomas N. Kamp of Lane & Waterman, Davenport, for appellee Greenwood Cleaning Systems.

McGIVERIN, Senior Judge,* participates in place of NEUMAN, J., who takes no part.

CARTER, Justice.

Midwest Janitorial Supply Corporation (Midwest) and Craig Hotchkiss, Bruce Hotchkiss, and Steve Hotchkiss, who are three of its officers and directors, appeal from an adverse judgment in their action against David Greenwood and Greenwood Cleaning Systems. Appellants assert that Greenwood took certain actions while he was an officer and director of Midwest to form a competing business operation that is now Greenwood Cleaning Systems. Appellants urge that in so doing Greenwood breached his fiduciary obligations to Midwest. The district court dismissed plaintiffs' claim following a bench trial. We affirm.

Both parties accept the findings of fact set forth by the district court. Relevant portions of the district court's findings are as follows. In the mid–1970s, two brothers, Bruce and Craig Hotchkiss, went to work with Chuck Norton, who owned a janitorial service in Cedar Rapids. Between 1977 and 1978, Bruce and Craig acquired more interest from Norton and brought another brother, Steve Hotchkiss, into the business. In 1978 the Hotchkisses founded the plaintiff company as a separate corporation independent of the janitorial service. Its business is the selling of janitorial supplies. In 1981 David Greenwood, who was married to the Hotchkisses' sister, Michele, was brought into Midwest. Bruce and Craig continued to own and operate the Cedar Rapids janitorial service. The three brothers and Greenwood owned equal shares and were directors of Midwest up to the time of Greenwood's resignation. Steve Hotchkiss was presi-

---

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

dent of Midwest, and Greenwood was vice president. Bruce and Craig Hotchkiss were not involved in the daily operation of Midwest nor were they compensated by Midwest. As Midwest grew and evolved in the 1980s, Steve Hotchkiss managed the home office of Midwest in Cedar Rapids, and Greenwood managed Midwest's only other office located in Davenport.

Beginning in about 1989 and continuing through 1994, Greenwood operated Midwest's business in Davenport autonomously from the Cedar Rapids operation. The Davenport operation, under Greenwood, grew substantially faster and was more financially successful than Midwest's Cedar Rapids business. Greenwood was Midwest's most productive salesperson, producing fifty percent of the sales in the Quad Cities area. Greenwood's independent operation of Midwest in the Quad Cities area was subject only to an occasional board meeting. His success was such that he was soon taking a salary and bonuses substantially exceeding those of Steve Hotchkiss. Greenwood's wife, Michele, was also on the Midwest payroll for part-time work handling accounts receivable and payable.

By 1994 Greenwood's operation of Midwest in Davenport became openly troubling to the Hotchkisses. They viewed the situation as one in which Greenwood was taking most of the profits from Midwest's operation in Davenport in salaries and bonuses, leaving little for those who worked at the headquarters office in Cedar Rapids. The brothers Hotchkiss were displeased with this situation because the four were equal shareholders in Midwest. Moreover, Bruce and Craig had put up most of the initial investment in the company.

In a 1994 board meeting, the three brothers voted to deny Greenwood's request for a $25,000 bonus and a salary increase for 1995. By February of 1995, the Hotchkisses, led primarily by Craig, increased their control over the Davenport operation. At an April 11 or 12, 1995 board meeting, Craig presented an "agenda" of Midwest company issues for board resolution. Greenwood objected to most items. The Hotchkisses outvoted Greenwood three to one, deciding to: require all four to sign a noncompete covenant (Greenwood never signed the covenant), consolidate all accounts receivable and payable into Midwest Cedar Rapids, draw all checks from one bank out of Cedar Rapids and require two signatures for each check, increase the rent Midwest paid to Midwest Janitorial Supply, Inc. for warehouse space, constrain Greenwood's salaries, bonuses, and use of company automobiles, begin paying Bruce and Craig salaries, and leave more of the profits in the business for distribution as dividends among the four shareholders.

Greenwood saw these changes as moving the business away from his successful Quad Cities operation and toward the less successful operation being carried on in Cedar Rapids. In an April 12, 1995 memo to the Hotchkiss brothers, he stated that he believed he and Michele were being forced out of the company. On April 17, 1995, Craig telephoned Michele and terminated her job with Midwest. Greenwood and his wife viewed this act as an escalation of a business dispute into a personal dispute.

At this point, the Greenwoods considered their options outside of Midwest. These options included joining another company, leaving the area, or starting their own janitorial supply business. During the last two weeks of April and first four days of May 1995, David Greenwood began preparation for a likely separation from Midwest. The Greenwoods shared their discontent with Midwest employees

at a social event held at the Greenwoods' home on April 21, 1995.

Before David's resignation from Midwest on May 5, 1995, the Greenwoods engaged in the following activities: contacting a realtor to seek availability of a warehouse, investigating the pricing of telephone systems, investigating the acquisition of new computer hardware and software, seeking a line of credit from a bank, and arranging for a sign company to supply signs for a new business location.

On Friday, May 5, 1995, David entered the Midwest office in Davenport at about 10 a.m. and tendered his resignation as director and vice president. At this time, he requested redemption of his shares in accordance with the shareholder's agreement. Michele drove to Midwest, picked David up, and they went directly to their attorney's office to prepare articles of incorporation and other documents to begin a new janitorial supply company. On Saturday, May 6, 1995, they executed a lease for an office and warehouse in the Quad Cities area. On Monday, May 8, 1995, they opened their new business, Greenwood Cleaning Systems, at that location. On that same day, the second most productive salesperson for Midwest in the Quad Cities area, Marilyn Korthaus, left Midwest to begin working for Greenwood Cleaning Systems. Two days later, another salesperson, Jeff Stanger, left Midwest and joined Greenwood's business. Greenwood's new company started making deliveries on May 25, 1995, and has progressed to a successful janitorial supply business in the Quad Cities area. During the first month it was in business, Greenwood Cleaning Systems had sales of $63,000, only $433 of which was derived from customers that had not previously been served by Midwest.

After finding that the facts were substantially as we have recited them, the district court concluded:

David exercised care in investigating his options. He made no preparations on company time or property. He did not solicit its sales staff. He did not tell vendors in advance. He did not solicit customers. Moreover, he took nothing with him when he left but his knowledge, experience, and goodwill. The fact that sales people, vendors, and customers went with David after he resigned and opened a new competing business is attributable to David having been the operator of [Midwest's Davenport operation] which, without him, was an empty shell.

David did not breach his duty of loyalty and good faith to [Midwest] by investigating the possibility of opening a competing business. He committed no act of disloyalty. He walked the fine line between investigating it and doing it. Initiating the contingency plans he and Michele made in this case and under these circumstances did not go over the line.

David did no act to damage [Midwest] while he was with it. When he decided to act contrary to the interests of [Midwest] he resigned. Thereafter, with no contract to the contrary, he owed [Midwest] no duty and was free to compete.

[Midwest's] claim fails.

The foregoing discussion formed the basis for the district court's disposition of plaintiffs' claim of breach of fiduciary responsibility. To the extent that it contains factual determinations concerning the extent of Greenwood's preparations to compete while still an officer and director of Midwest those factual findings are supported by substantial evidence. The plaintiffs also alleged theories of recovery involving usurpation of corporate opportu-

nity, wrongful utilization of trade secrets, palming off, and tortious interference with its business, all of which were rejected by the district court. On appeal plaintiffs only assert error with respect to the breach-of-fiduciary-duty claim.

■ In considering plaintiffs' claims, we begin with the recognition that directors and officers of a corporation have a fiduciary duty to act in all things wholly for the benefit of the corporation. *Midwest Mgmt. Corp. v. Stephens,* 353 N.W.2d 76, 80 (Iowa 1984); Iowa Code §§ 490.830(1)(c), 490.842(1)(c). This duty limits a director's or officer's conduct both as to actions taken on behalf of the corporation and actions taken in the fiduciary's own behalf that may have an effect on the corporation. *Holden v. Constr. Mach. Co.,* 202 N.W.2d 348, 358 (Iowa 1972).

Plaintiffs assert that the actions Greenwood took to form a competing business while he was still an officer and director of Midwest were manifestly detrimental to Midwest's interests and therefore a violation of his fiduciary duty to the corporation. Appellees on the other hand urge that the law allows an officer or director of a corporation contemplating resignation to make preparations for a competing business prior to leaving. That is the view expressed in *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 256, 531 P.2d 428 (1975), in which the court states:

> At the time a director or officer is removed or resigns from the corporation his position of trust with the corporation is terminated. *It is generally held in such case that even before termination he is entitled to make arrangements to compete,* except he cannot properly make use of confidential information peculiar to the corporation's business and acquired therefrom. Thus, he may purchase or initiate a rival business before the end of his relationship as an officer

or director and upon termination of his employment immediately compete.

*Parsons Mobile Prods.,* 531 P.2d at 432–33 (emphasis added). The views espoused by the Kansas court have also been accepted in *Vigoro Indus., Inc. v. Crisp,* 82 F.3d 785, 788 (8th Cir.1996); *Raines v. Toney,* 228 Ark. 1170, 313 S.W.2d 802, 809 (1958); *Ellis & Marshall Assocs., Inc. v. Marshall,* 16 Ill.App.3d 398, 306 N.E.2d 712, 716 (1973); and *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 569 (1978).

The authorities relied upon by plaintiffs to establish a less tolerant rule of fiduciary responsibility, *Bentz v. Vardaman Manufacturing Co.,* 210 So.2d 35 (Miss.1968), and *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476 (Ky.1991), are, we believe, distinguishable on their facts from the present controversy. In imposing liability on a competing former director in *Bentz,* the court stated: "A director is not relieved from liability by the fact that plans which were made and partially carried out while he was in office are consummated after he has ceased to be a director." 210 So.2d at 41. But, the liability imposed in that case was for self-dealing initiated by the director prior to his resignation and not for initiating a competing business.

In imposing liability on a former director in the *Steelvest* case, the court stated that corporate directors or officers seeking to establish a competing enterprise "should terminate their position/status as directors or officers when they first make arrangements or begin preparations to compete directly with the employer corporation." 807 S.W.2d at 483. The preparation to compete that took place in that case, however, extended over a period of eleven months, while the defendant remained as a director of the corporation and included solicitation of financing for

defendant's new company from his former company's leading customers.

An insightful analysis of whether mere preparation to form a competing business organization is actionable as a breach of fiduciary obligation is found in *Cudahy Co. v. American Laboratories, Inc.*, 313 F.Supp. 1339, 1346 (D.Neb.1970), and *Bancroft–Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921, 936 (1966). Both cases conclude that such conduct is not actionable unless it is shown that something in the preparation to compete produced a discreet harm to the former business beyond the eventual competition that results from the preparation. We accept that conclusion as a reasonable approach to the problem.

The most disturbing thing that occurred in connection with the start up of Greenwood's new business was the act of a saleswoman who left Midwest to join the new business. Before leaving Midwest she persuaded one of its customers to send its bidding form to her residence so that Midwest would not receive it and she could use it once she entered Greenwood's employment. However, Greenwood's complicity in this act was not established and, more critical to plaintiffs' claim, there was no showing that this act was a factor in diverting business from Midwest to Greenwood. Accepting the findings of the district court as to the preparations to compete that took place while Greenwood was still an officer and director of Midwest, the period in which those preparations took place was extremely brief. He was positioned to start his new business very quickly even if his preparation had been delayed until after his resignation from Midwest. It does not appear therefore that acts Greenwood undertook in preparing to form a competing business provided a discreet harm to Midwest beyond the eventual competition, which re-

sulted in part from those preparatory acts. Based on these considerations, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except NEUMAN, J., who takes no part.