PFS DISTRIBUTION COMPANY and
Pilgrim's Pride Corporation of
Delaware, Inc., Plaintiffs,

v.

Darrell RADUECHEL, Barry Spain
and D & B Solutions, Inc.,
Defendants.

No. CIV.4–04–CV–10329.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 11, 2004.

Michael W. Thrall, Nyemaster Goode Voigts West Hansell & O'Brien PC, Des Moines, IA, William Lynch Schaller, John M. Murphy, Michael J. Wagner, Ethan A. Berghoff, Baker & McKenzie, Chicago, IL, for Plaintiffs.

Douglas A. Fulton, Gordon R. Fischer, Bradshaw Fowler Proctor & Fairgrove, Des Moines, IA, for Defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

LONGSTAFF, Chief Judge.

THE COURT HAS BEFORE IT plaintiffs' motion for preliminary injunction, filed June 21, 2004.[1] Defendants filed a preliminary resistance memorandum on July 19, 2004 and plaintiffs filed a supplemental memorandum incorporating newly added claims the same day.[2]

Also on July 19, 2004, plaintiffs filed a motion for default judgment, based on defendants' alleged pre-litigation destruction of computer evidence. The Court held a hearing on July 20, and 21, 2004, and the parties submitted written final arguments and deposition transcripts on August 4, 2004.[3] The motions are fully submitted.

### I. BACKGROUND[4]

#### A. Operation of Oskaloosa Facility

Plaintiff PFS Distribution Company ("PFS") owns and operates a food distribution center located in Oskaloosa, Iowa ("the Oskaloosa center," or "PFS Oskaloosa"). PFS is a wholly-owned subsidiary of Pilgrim's Pride Corporation of Delaware, Inc. ("Pilgrim's Pride"). Pilgrim's Pride, the second-largest poultry producer in the United States, boasts net sales in excess of $5 billion. Plaintiffs employ more than 40,000 individuals, with facilities in at least nineteen states.

The Oskaloosa center is one of 16 food distribution centers operated by PFS nationwide. From December 2003 through early June 2004, approximately [REDACTED] of the Oskaloosa center's business was derived from the distribution of poultry and other meats. To conduct this business, the Oskaloosa center arranges for truck transportation of meat products from the meat suppliers' place of business to the center, and then ships the meat products to customers located within a 300–mile radius of Oskaloosa. Until June of this year, [REDACTED]% of the Oska-

---

1. Plaintiffs filed a motion for temporary restraining order ("TRO") contemporaneously with their motion for preliminary injunction. Due to a conflict in this Court's schedule, the motion for TRO was assigned to Senior United States District Judge Harold Vietor. Judge Vietor held a hearing on June 23, 2004, and denied the motion the same day. Since that time, both sides have conducted additional discovery and submitted new evidence to the Court separately, and in conjunction with the July 20–21, 2004 hearing.

2. Defendants filed a supplemental memorandum addressing plaintiffs' new claims on July 30, 2004.

3. Plaintiffs originally requested an evidentiary hearing of at least 4–5 days in duration. This Court was unable to accommodate such a lengthy hearing due to its pending criminal docket. The Court suggested, however, that plaintiffs make every effort to condense the actual court-time needed by relying on written deposition transcripts, affidavits, etc. Accordingly, despite resistance from defendants, plaintiffs' July 19, 2004 motion to supplement the preliminary injunction record is granted. The post-hearing evidence submitted by plaintiffs has been considered in full.

4. At the close of the July 21, 2004 hearing, the Court directed the parties to file proposed findings of facts in conjunction with their written final argument. Although plaintiffs complied with this request, defendants did not. Accordingly, a large portion of the Court's findings are taken verbatim from Plaintiffs' Proposed Findings of Fact, to the extent the Court found the proposed facts relevant, and consistent with the record.

loosa center's poultry and meat sales were made to [REDACTED] customers: [REDACTED].

The remaining [REDACTED]% of its business involved meat trading and truck brokering. The center's "trading" operation consists of a small number of independent traders who purchase and re-sell poultry and other meat products backed by PFS' credit, with the Oskaloosa center paying the suppliers, billing the customers and ultimately, splitting the profits with the traders. Neither the trading nor the truck brokerage operation, which is run out of a facility in Dothan, Alabama, demand a physical presence in Oskaloosa, Iowa.

The Oskaloosa operation originally was owned by Bob Lynn, who sold it to ConAgra Poultry Company in the mid–1970s. Pilgrim's Pride, through one of its affiliates, acquired ConAgra Poultry in November 2003. The Oskaloosa center moved to its present facility approximately three years ago, with Bob Lynn remaining as the landlord through his company, Surol, under a five-year lease running from April 2001 through March 2006. The center employed approximately 30 individuals in June 2004.

In fiscal year 2003, the Oskaloosa center achieved gross revenues of $60—70 million, with a profit of [REDACTED]. Prior to the filing of the complaint in this matter, this information was never publicly disclosed by plaintiffs. In addition, plaintiffs have kept confidential all other financial and operating information relating to the Oskaloosa facility, including the exact mix of customers, the percentage of revenues derived from various business components, the profit margins of the center in general, the profit margins of each business component, and the profit margins with respect to each client or account. Contrary to defendants' representation, the consolidated financial statements published by ConAgra and Pilgrim's Pride do not provide specific information relating to the Oskaloosa facility.

B. Raduechel's Employment History

Defendant Darrell Raduechel was employed at the Oskaloosa center since 1979. He began in 1979 as office manager, and served as the general manager of the center since 1993. His position as general manager gave Raduechel complete control of all aspects of the Oskaloosa center, and complete access to all information generated by the center.

In 1981, Raduechel executed a "conflict of interest" agreement that prohibited him from assisting or investing in a competing company. Subsequently, in 2003, he signed an incentive plan agreement, stating he would not directly or indirectly engage in sales or distribution activities within a 50 mile radius of the Oskaloosa center during the term of his employment and for a period of one year thereafter, and that he would not induce other Oskaloosa center employees to engage in similar activities during the same time period.

Over the years, Raduechel was personally responsible for establishing many of the Oskaloosa center's long-standing customer relationships, and retained personal control of one major customer account, Affiliated Foods. Raduechel also personally managed all "trading" activities.

C. Spain's Employment History

Defendant Barry Spain began work at the Oskaloosa center as a truck driver in 1987. He worked his way up to operations manager in 1994, and ultimately, sales manager in 1996. In this position, Spain was considered the center's "second-in command," and had supervisory authority over all Oskaloosa center employees other than Raduechel, Office Manager Lisa Gunsolley and two accounting personnel.

In addition to overseeing sales activities, Spain also was the center's *de facto* manager of information technology. Spain's knowledge of computers was self-taught, however, and other than a brief reference in a 1997 document approving Spain for a compensation increase, there is no evidence that managing the center's computers was considered one of Spain's "assigned duties."

Early in his tenure with the Oskaloosa center, while still driving a route truck, Spain bought with his own funds a software program, Microsoft Access Suite, and began tailoring one of its applications, Microsoft Access, to develop an order entry system for use by two small oil companies, Ogden Oil and Cobb Oil. He later tailored this same order entry system for use by the Oskaloosa center, but apparently did so on his home computer, not at work. Raduechel and Spain later downloaded and/or copied a version of the software and installed it on the computer system of D & B Solutions.

In 1994, Spain executed an employee agreement under which he agreed, in relevant part, as follows:

> to promptly disclose to the company all inventions, discoveries, improvements, designs, trademarks, or copyrightable matter conceived or made by me during my employment and related to the business of the company, and I hereby assign all of my interest therein, including the goodwill of the business symbolized by any trademarks, to the company.

Plaintiffs' Exh. 15, Hearing Tr. at 52–53. Both Raduechel and Spain, as well as all Oskaloosa center office employees, also entered into confidentiality agreements with PFS and/or its predecessor-in-interest, prohibiting them from using or disclosing any of PFS' confidential information.

### D. Events Leading to the formation of D & B Solutions

Soon after Pilgrim's Pride acquired ConAgra Poultry, and with it, the Oskaloosa center, Pilgrim's Pride communicated to former ConAgra general managers, such as Raduechel, that it was considering making fundamental changes to the "salary plus bonus" compensation system employed by ConAgra. During a meeting of general managers held in Dallas, Texas in December 2003, the executive assistant to Pilgrim's Pride Vice President Robert "Bobbie" Matkin told Raduechel that, in essence, "he might as well get used to not making the money that [he] had become accustomed to because it just wasn't going to happen." Hearing Tr. at 79. Raduechel later shared his concerns with Spain, and Gunsolley, and began talking to both about organizing a rival firm.

The hearing testimony established that Raduechel first approached Spain about a possible new venture, to be called, "D & B Solutions," in January 2004. In the middle of the same month, Raduechel and Spain met with John Pothoven and Steven Hicks of MidwestOne Bank & Trust in Oskaloosa to discuss financing for D & B Solutions. MidwestOne Bank & Trust also is the bank used by the Oskaloosa center for its day-to-day banking needs.

Pothoven and Hicks told Raduechel and Spain that before MidwestOne Bank & Trust could consider a proposed loan, the men must develop a business plan, with financial projections. To accomplish this task, Pothoven recommended that Raduechel and Spain meet with Richard Donohue, a certified public account and principal of Theobald, Donohue & Thompson, P.C., in Oskaloosa.

Donohue met with Raduechel and Spain on several occasions between January 27, and February 20, 2004. During these meetings, Raduechel provided Donohue

with a number of documents containing the following confidential PFS documents: 1) PFS Oskaloosa's Operating Statement for fiscal year 2003, PFS Oskaloosa's Gross Profit Analysis for fiscal year 2003; a revenue and profit report for PFS Oskaloosa's trading business and trucking business covering 2002 through part of 2004; PFS Oskaloosa's calendar year 2003 Customer Product Analysis Report for Fareway Foods; PFS Oskaloosa's calendar year 2003 Customer Product Analysis Report for Affiliated Foods; PFS Oskaloosa's balance sheet for the period ending May 2003 and PFS Oskaloosa's income statement for the period ending May 2003. Donohue told Raduechel he did not want these documents, but apparently retained them in his files nonetheless. The business plan ultimately used by Raduechel and Spain to obtain the MidwestOne Bank & Trust financing relied upon PFS Oskaloosa's "actual sales" information.[5]

In addition to seeking financing for their new venture, Raduechel and Spain began talking almost immediately to Oskaloosa center employees about joining them at D & B Solutions. By April 26, 2004, Raduechel and/or Spain had extended employment offers, complete with salary figures, to the following PFS employees: Lisa Gunsolley, Brian Imhoff, Jay Owens, Greg Robbins, Victor Scavo and Jeff Steen. Ron Witt, the warehouse manager, received an offer on May 21, 2004. The only office employees not receiving offers were Melissa Higgins Witt, who performed accounting services, and receptionist Jodie Stout. It appears several of these employees tentatively accepted the offers, as the business plan explicitly identifies Brian Imhoff, Greg Robbins, and Jeff Steen as members of the new "team."[6]

One employee, Gunsolley, testified during the hearing that she was "totally confused" about whether to accept the offer of employment. Hearing Transcript at 437. Although she was disappointed Raduechel and Spain would not make her a partner in the new venture, she was also fearful the Oskaloosa center would close if Raduechel and Spain succeeded in taking the majority of PFS Oskaloosa's business. She was also concerned that if Raduechel decided not to leave, or if she reported Raduechel's and Spain's plans to senior management, Raduechel would retaliate against her by eliminating or substantially reducing the amount of her bonus, which represented approximately 50% of her total compensation.

As early as January and February, 2004, Raduechel and Spain involved other PFS employees, Victor Scavo and Brian Imhoff, in their efforts to form a new company.[7] In January, Scavo helped Raduechel and Spain find warehouse and office space for their new location in Des Moines, Iowa, where Scavo resides. Scavo accompanied Raduechel on at least two visits to C & C Distribution Co., the firm that now provides space to D & B Solutions. Raduechel also told Scavo not to disclose Raduechel's and Spain's plans to form a new firm in competition with PFS. In addition to Scavo, there is evidence Brian Imhoff, then dispatcher/traffic manager for the Oskaloosa center,[8] accompanied Raduechel and

---

5. MidwestOne Bank & Trust approved Raduechel's and Spain's loan applications by late April 2004, and provided commitments for specific forms of credit in May.

6. Ultimately, Jay Owens, Brian Imhoff and John Roberts, a truck driver, were the only PFS employees to join Raduechel and Spain at D & B Solutions.

7. Although Raduechel and Spain made a formal job offer to Scavo, a trader, Scavo ultimately decided to remain with PFS.

8. Imhoff currently is employed by D & B Solutions.

Spain on at least one visit to Des Moines for the purpose of securing warehouse and office space for D & B Solutions.

While still under plaintiffs' employ, Raduechel and Spain informed at least five Oskaloosa center customers-including Fareway and Affiliated Foods-of their intent to form a new venture. Both men also admitted during the hearing that they informed several poultry suppliers of their plans during the same time period. Although neither Raduechel nor Spain admit to actively *soliciting* business from these customers before separating from the center, the men informed Donohue they would not take the "employee group" until they were sure the major customers were on board.

In addition, on June 10, 2004, five days before announcing his resignation, Spain sent an e-mail concerning D & B Solutions from his computer at the Oskaloosa center to poultry client Thoms Proestler. At that time, Spain expected his last day of work at the Oskaloosa center would be Tuesday, June 22, 2004, and that he would be working at D & B Solutions on Wednesday, June 23. Given this timetable, in his e-mail, Spain told Thoms Proestler that on June 23, he would fax pricing information on behalf of D & B Solutions, and there would be "no changes" from the Oskaloosa center's pricing for products delivered by D & B Solutions during the week beginning Monday, June 28. Spain wanted Thoms Proestler to begin placing orders with D & B Solutions on Thursday, June 24, for delivery beginning Monday, June 28, and promised that Thoms Proestler's "transition" from PFS Osklaloosa to D & B Solutions would be "totally seamless." Plaintiffs' App. J: Hearing Exh. 17.

Raduechel and Spain also were well aware of the impact the loss of these major customers would have on the Oskaloosa center. Their business plan states defendants' intent to divert the Oskaloosa center's two largest poultry customers, Fareway and Affiliated Foods:

> Poultry sales makes up about [REDACTED]% of our business and our two major accounts make[ ] up [REDACTED]% of the poultry sales. Without our two major poultry sales accounts, they can only operate on [REDACTED]% of our total current business!

Plaintiffs' App. J: Hearing Exh. 16 at TD & T 97.

Meanwhile, on Monday, June 7, 2004, Raduechel provided PFS with notice of his resignation, which was to take effect on Friday, June 18, 2004. In actuality, Raduechel's last day in the Oskaloosa center was June 11, 2004. On June 8, 2004, Raduechel and Spain traveled to Des Moines to install D & B Solutions' new computer system.

On Friday, June 11, 2004, Spain, in Raduechel's presence, deleted all of the data on Raduechel's computer at the Oskaloosa center. Defendants then ran a "defrag" program, which helps to ensure deleted information cannot later be retrieved. Spain also ran a "defrag" program on his own PFS computer later the same day.

On Tuesday, June 15, 2004, Spain served notice of his resignation. Spain's last day of work at the center was Thursday, June 17, 2004.

### E. Post–Resignation Occurrences and Effects on Oskaloosa Center

Pilgrim's Pride Executive Vice President Ron Caravella traveled to Oskaloosa on Monday, June 14, 2004 to investigate Raduechel's and Spain's departures. On Wednesday, June 16, Caravella sent a memorandum to Raduechel, Spain and Imhoff emphasizing their legal obligation to preserve evidence relating to their departure from the company, and directing them to return all company property within

their possession or control. Raduechel and Spain signed copies of the memorandum on June 17.

As outlined above, plaintiffs commenced the present action and request for injunctive relief on June 21, 2004. On July 17, defendants produced to plaintiffs computer disks containing PFS' proprietary information including, among other things, profit and loss statements for the Oskaloosa center and the center's fiscal year 2004 budget.

Meanwhile, immediately following Raduechel's and Spain's departures from PFS, the Oskaloosa center lost approximately [REDACTED]% of its poultry and meat business to D & B Solutions. This loss of sales includes Fareway Foods, Affiliated Foods and Allen Foods. In May 2004, the PFS Oskaloosa center sold [REDACTED] million pounds of poultry per week. As of July 16, 2004, the Osklaloosa center was selling only [REDACTED] pounds of poultry per week.

The drop in business has produced a corresponding loss in revenue and profit. Before Raduechel's and Spain's departure, the Oskaloosa center generated profits in the range of [REDACTED] per week. As of July 16, 2004, the Oskaloosa center had sustained losses for three consecutive weeks, including a [REDACTED] loss for the week of July 12, 2004.

Matkin, Pilgrim's Pride vice president, testified that PFS will close the Oskaloosa center if it continues to operate at a loss. In the event the facility closes, PFS will incur significant penalties under its lease, and the center's 27 employees will be forced to find other employment.

During the hearing, evidence was presented showing Raduechel had a personal net worth of $761,982. This amount, however, includes $321,199 in deferred employment compensation, which has not been paid by plaintiffs, and may be subject to forfeiture. Much of the remaining $440,783 is comprised of a 401(K) investment, home and vehicle equity that may be exempt from a judgment execution under federal and/or state law.

Spain has a personal net worth of $61,700. In addition, both Raduechel and Spain have given personal guarantees on almost $600,000 in credit obtained by D & B Solutions. Raduechel, Spain and D & B Solutions also owe $150,000 on a note to Raduechel's relatives.

As of the week of July 18, 2004, D & B Solutions' accounts payable approximated $350,000 and its accounts receivable approximated $440,000. All of D & B Solutions' obligations to Midwest*One* Bank & Trust are secured by a first lien on all of D & B Solutions' assets, including accounts receivable, inventory, furniture, fixtures and equipment.

F. Potential Harm to Defendants if Injunction is Granted

All five employees of D & B Solutions also would undergo financial hardship in the event an injunction was granted. As set forth above, Raduechel and Spain have signed personal guarantees to secure more than $750,000 in credit, although not all of this credit has been drawn upon. In addition, Raduechel, Spain and Imhoff have moved themselves and their families from the Oskaloosa area to the Des Moines area, and have purchased, or contracted to purchase, homes in the Des Moines area.

G. Present Complaint

Count I of the original complaint sets forth a cause of action for breach of fiduciary duty against defendant Raduechel; count II alleges defendant Spain also breached his fiduciary duties; count III alleges defendants Raduechel and Spain engaged in civil conspiracy; and count IV alleges all defendants have been unjustly enriched by their allegedly wrongful con-

duct, and requests that the Court impose a constructive trust on revenues attributed to defendants' alleged wrongdoing.

PFS amended its complaint on July 26, 2004, joining its parent company, Pilgrim's Pride, as a party plaintiff. In addition to the claims alleged in their original complaint, plaintiffs have added new claims against all defendants for copyright infringement (count V); and misappropriation of trade secrets pursuant to the Iowa Trade Secret Act (count VI). Plaintiffs now seek preliminary injunctive relief on all counts.

## II. APPLICABLE LAW AND DISCUSSION

In determining whether to grant preliminary injunctive relief, this Court must consider the following factors: 1) plaintiff's probability of success on the merits; 2) the threat of irreparable harm to plaintiff; 3) the balance between this harm and potential harm to others if relief is granted; and 4) whether an injunction serves the public interest. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485 (8th Cir.1993) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981)).

### A. Probability of Success on the Merits

#### 1. Breach of Fiduciary Duty

Counts I and II of the amended complaint allege the conduct of defendants Raduechel and Spain in the approximately six-month time preceding their departure from PFS breached fiduciary duties each owed to the company. Amended Complaint at ¶¶ 71–84. The Iowa Supreme Court has held that "a principal-agent relationship gives rise to a fiduciary duty of loyalty, and an employer-employee relationship can be closely associated with a principal-agent relationship." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 599 (Iowa 1999). The extent of any duty owed by an employee varies, depending on the nature of the employee's position within the company, and the degree of confidence entrusted to him or her. *Id.* at 600. Following this premise, the *Condon* court suggested an employee could be held liable for breach of fiduciary duty in situations of "direct competition, misappropriation of profits, property, or business opportunities, trade secrets and other confidences." *Id.* To prevail on such a claim, however, the employer must show the breach committed by the employee resulted in "substantial assistance to the competitor." *Id.* (citing *Cameco, Inc. v. Gedicke*, 157 N.J. 504, 724 A.2d 783, 789 (1999)). Furthermore, such a claim is viewed narrowly, to ensure an employer is not given an unfair advantage in the marketplace. *Id.*

Plaintiffs allege defendants Raduechel and Spain breached their respective fiduciary duties to PFS by engaging in the following conduct prior to their resignations:

(a) soliciting PFS' employees

(b) coordinating the near-simultaneous resignation of PFS' employees, in order to cripple the Oskaloosa distribution center's operations;

(c) soliciting plaintiff's customers, brokers and traders;

(d) asking plaintiffs' customers to, beginning on June 23, 2004, place orders with D & B Solutions rather than plaintiffs, in order to leave plaintiffs with a maximum competitive disadvantage; and

(e) using plaintiffs' computers and telephones to accomplish these unlawful ends.

Amended Complaint at ¶ 80. Based on evidence presented during and following the hearing, the Court finds sufficient evidence to find each man both owed and

repeatedly breached his duties to PFS between January and early June 2004.

### a. Defendant Raduechel

The evidence shows ConAgra Poultry, and its successor, PFS, entrusted Raduechel with a great deal of authority in managing the Oskaloosa center. In addition to managing the day-to-day operations of the center, Raduechel handled the hiring and firing of employees, supervised at least one major account, and awarded annual employee bonuses. Hearing Transcript at 39, 71. Raduechel also enjoyed access to all financial information generated by the center, such as general profit and loss information, profits generated per customer, and particular customer market share. *See* Hearing Tr. at 107 (admitting he shared certain confidential financial information with consultant Donohoe). Based on the evidence before it, this Court concludes Raduechel's position with the Oskaloosa center was the type contemplated by the Iowa Supreme Court in *Condon* as giving rise to a fiduciary duty of loyalty. *See Condon,* 604 N.W.2d at 599. The fact Raduechel signed first a conflict of interest agreement, and later a confidentiality agreement, and *supervised other employee's execution* of similar confidentiality agreements confirms that Raduechel was well aware of the need to guard proprietary information.[9]

Having found Raduechel likely owed a common law duty of loyalty to plaintiffs, the Court also concludes a jury likely would find he breached that duty through his conduct beginning in January 2004. The evidence shows that in mid-January, Raduechel first spoke openly with other Oskaloosa center employees about starting a competing business. Hearing Tr. at 128–30, 268 (conversations with Spain); 437 (Gonsolley). Under certain circumstances, this conduct *alone* may have been sufficient to establish a breach of Raduechel's duties to PFS. *See Porth v. Iowa Dep't of Job Service,* 372 N.W.2d 269, 273 (Iowa 1985); *see also Condon,* 604 N.W.2d at 599 (citing *Porth* ). In addition to soliciting plaintiffs' own employees, however, the record shows that, while on plaintiffs' payroll, Raduechel met with a business consultant and bankers to arrange financing for his new venture. Hearing Tr. at 267–68. He also shared proprietary financial information with consultant Donohue and the bankers, and investigated warehouse space for his new business in Des Moines. *See id.* at 107; Plaintiffs' App. J, Hearing Exh. 16 at TD & T 124–138 (documents given to Donohue); Plaintiffs' App. Exh. E, Hicks Dep. at 13, 35–36 (financial data shared with Hicks); Hearing Tr. at 168–72 (investigated warehouse space in Des Moines). The fact Raduechel and Spain hired Imhoff, Owens and Roberts within days of their own departure from the Oskaloosa center further suggests Raduechel and Spain had affirmances from key clients while still employed by plaintiffs.

In resisting plaintiffs' motion for preliminary injunction, defendants cite to *Midwest Janitorial Supply Corp. v. Greenwood,* 629 N.W.2d 371, 375 (Iowa 2001) for the premise that a company fiduciary contemplating resignation generally may make arrangements to compete prior to termination without violating his fiduciary duties. Omitted from defendants' citation, however, was the court's very next state-

---

9. Defendants question whether PFS, a successor corporation, may enforce the confidentiality agreement signed by Raduechel in 1994, when ConAgra Poultry owned the Oskaloosa center. Regardless of whether Raduechel, or Spain, were *contractually* bound to conceal proprietary information, however, the Court finds they were bound to do so under common law. The fact both men executed confidentiality agreements simply enforces the fact they knew the importance of nondisclosure.

ment emphasizing that to stay within legal boundaries, the fiduciary *may not* "make use of confidential information peculiar to the corporation's business and acquired therefrom." *Midwest Janitorial Supply,* 629 N.W.2d at 375. This fact distinguishes *Midwest* from the present case, where defendants used actual company financial figures to produce their rival business plan. *See gen.* Plaintiffs' App. J: Hearing Exh. 16 at TD & T 124–138. Also significant to the court in *Midwest* was the fact the departing executive "made no preparations on company time or property.... did not solicit its sales staff.... did not tell vendors in advance.... did not solicit customers.... [and] took nothing with him when he left but his knowledge, experience, and goodwill." *Id.* at 374. These facts are clearly contrary to those in the present case, where the record suggests defendants spoke about their plans to virtually anyone who would listen-other than Pilgrim's Pride executives, of course.

Granted, the *Midwest* court ultimately adopted holdings from other jurisdictions concluding that a fiduciary's preparation to compete "is not actionable unless it is shown that something in the preparation to compete produced a discreet harm to the former business beyond the eventual competition that results from the preparation." *Id.* at 376. In the present case, however, the proprietary financial information and customer data given by defendants to consultant Donohue-which possibly are still within defendants' possession-give D & B Solutions an unfair advantage in competing with the Oskaloosa center. As explained by Gunsolley, if competitors were given access to PFS' profit margins, product mixes and customer market share, they likely would undercut PFS' prices and "steal" accounts. Hearing Tr. at 447–48. Allowing defendants to compete with this type of information undoubtedly has, and will, produce the type of "discreet harm" contemplated by the *Midwest* court. Ac-

cordingly, the Court finds plaintiffs are likely to succeed on the merits of their Iowa common law claim for breach of fiduciary duty on the part of defendant Raduechel.

### b. Defendant Spain

Count II of plaintiff's amended complaint sets forth a parallel cause of action for breach of fiduciary duty against defendant Spain. Amended Complaint at ¶¶ 78–84. As sales manager, Spain was not vested with the degree of authority and responsibility given to Raduechel. Nevertheless, he retained supervisory authority over several Oskaloosa center employees, and served as acting general manager in Raduechel's absence. Hearing Tr. at 252–53. Because of his unique access to salaries of those individuals who reported to him, as well as specific customer sales data and preferences, *see, e.g.,* Hearing Tr. at 73–76, 283–84, the Court finds that, like Raduechel, Spain owed PFS a fiduciary duty of loyalty. *Condon,* 604 N.W.2d at 599.

Having reached this conclusion, the Court next finds plaintiffs are likely to succeed on their claim that Spain breached his fiduciary duties by engaging in much of the same conduct found unlawful with regard to Raduechel. Although Spain did not have *direct* access to general PFS financial data, Spain admitted creating a spreadsheet to help Raduechel incorporate the necessary data in their business plan for D & B Solutions. Hearing Tr. at 281. The evidence also reflects that Spain helped Raduechel solicit Oskaloosa center employees to join them in their new company while still on the PFS payroll. Hearing Tr. at 171–75. Perhaps most importantly, Spain admitted to informing all of his major customer contacts of his intent to form a rival corporation prior to June 2004, and actively solicited at least one

PFS client. A June 10 e-mail written by Spain on his PFS computer to poultry client Thoms Proestler indicates Spain had already begun transferring Thoms Proestler's business to D & B Solutions, and would do so at PFS' pricing levels. Plaintiffs' App. J, Hearing Exh. 17. The fact Spain acknowledged that ultimately, it was the client's choice whether to transfer their business to D & B Solutions does not change the fact Spain blatantly sought to steal business while employed by PFS. The Court holds that a reasonable jury is likely to find Spain's conduct crossed the "fine line" between upholding his obligations to PFS and preparing for his new business venture. *See Midwest Janitorial Supply,* 629 N.W.2d at 375.

### 2. Civil Conspiracy and Unjust Enrichment.

Count III of plaintiffs' amended complaint alleges that the conduct supporting plaintiffs' claims for breach of fiduciary duty also supports a claim for civil conspiracy. Amended Complaint at ¶¶ 85–88. Because the Court concluded that both alleged co-conspirators likely will be found liable for breach of fiduciary duty, there is no need to address civil conspiracy independently at this juncture. *See, e.g., Wright v. Brooke Group Ltd.,* 652 N.W.2d 159, 172 (Iowa 2002) (" 'Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action. . . . Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert.' ") (internal citation omitted).

Under Count IV of their amended complaint, plaintiffs seek the imposition of a constructive trust on D & B revenues, based on a theory of unjust enrichment. Amended Complaint at ¶¶ 89–93. "A constructive trust is an equitable remedy courts apply to provide restitution and pre-vent unjust enrichment." *Berger v. Cas' Feed Store, Inc.,* 577 N.W.2d 631, 632 (Iowa 1998) (citation omitted). Plaintiffs' request for a constructive trust is addressed later in this Order.

### 3. Copyright Infringement

■ Count V of plaintiffs' amended complaint alleges defendants' conduct in reproducing and using a version of the database software application developed by Spain violated the Copyright Act of 1976, 17 U.S.C. §§ 301 *et seq.* Amended Complaint at ¶ 96. To establish a claim for copyright infringement, a plaintiff must show 1) he or she owns the copyright at issue; and 2) copying by the defendant(s). *See, e.g., Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 941 (8th Cir.1992).

### a. Whether Software is "Work Made for Hire"

■ Generally, the owner of a copyright "is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). An exception exists, however, when an item is considered a "work made for hire," in which case, the copyright vests with the employer or party that commissioned the work. *See* 17 U.S.C. § 201(b); *Kirk v. Harter,* 188 F.3d 1005, 1007 (8th Cir.1999) (citing statute).

A "work made for hire" is defined in relevant part as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. The Copyright Act does not expressly define "scope of employment." Accordingly, courts must rely on common law principles to interpret the phrase. *Reid,* 490 U.S. at 741, 109 S.Ct. 2166 (holding that Congress

intended to incorporate common law principles into Copyright Act).

 Section 228 of the Restatement (Second) of Agency sets out three factors as relevant in determining whether a work was created within "the scope of employment;" 1) whether the work is of the type for which the author was hired to perform; 2) whether the design was created "substantially within the authorized time and space limits" of the job; and 3) it was "actuated, at least in part, by a purpose to serve" the employer's interests. Restatement (Second) of Agency § 228. Plaintiffs' ability to establish any of these factors is questionable in the present case.

With regard to the first factor, the record shows Spain worked for the Oskaloosa center as a truck driver between 1987 and 1994, when he was promoted to operations manager. Hearing Tr. at 250. Plaintiffs do not argue, and there is no evidence to suggest that developing software applications was within Spain's job description as truck driver or operations manager.[10] Spain was promoted to sales manager in 1996. Hearing Tr. at 253. At some point during his tenure, Spain's self-taught knowledge of computers caused him to became the center's "de facto" computer expert-the person to whom all other employees looked for help when they experienced problems with their personal computers. Other than a brief reference in a 1997 performance appraisal commending Spain for his data entry software, however, there is no evidence that Spain's position as sales manager required him to manage the company's computers and/or develop

software. *See* Plaintiffs' App. J, Hearing Exh. 3.

The next factor to consider is whether the software at issue was designed "substantially within the authorized time and space limits" of Spain's position with PFS. Restatement (Second) of Agency § 228. Spain testified during the hearing that while employed by PFS as a truck driver, he purchased a copy of Microsoft Office Suite for personal use, and modified one of its applications, Microsoft Access, to develop an order entry system. Hearing Tr. 384. Spain further testified that he made the modifications on his home computer on nights and weekends, and sold or licensed the system for use by several small businesses, including Ogden Oil Company and Cobb Oil Company. *Id.* at 386. Apparently, some of these small companies are still using the software. *Id.* at 387.

The evidence then shows that in 1996 or 1997, Spain further modified the order entry system for use by PFS, to "simplify [his] job" as sales manager. Plaintiffs' App. C: Spain Dep. At 45.[11] He expressly denied being asked by anyone at PFS to tailor the program for its use, however, and there is no evidence he made the PFS modifications on company time. Hearing Tr. at 386.

The third factor is whether development of the software was "actuated, at least in part, by a purpose to serve" the employer's interests. Restatement (Second) of Agency § 228. Clearly, Spain *modified* his order entry system to help PFS operations run more smoothly. Without more evidence regarding the degree to which

---

**10.** Spain testified that his duties as operations manager included "unloading the incoming trucks, reloading outbound trucks, loading the route trucks, scheduling the route deliveries, just the warehouse and deliveries in general." Hearing Tr. at 252.

**11.** Plaintiffs claim that Spain's deposition and hearing testimony are inconsistent on this issue. The Court declines to find such an inconsistency, noting that Spain was not asked during the deposition about use of the order entry system by other companies. Plaintiffs' App. C: Spain Dep. At 45.

PFS' system differs from that Spain developed for the oil companies and other small businesses, this factor does not support plaintiffs' claim that the software application system was in fact a "work for hire."

### b. Whether Plaintiffs Nevertheless Owned Software

■ Plaintiffs argue alternatively that even if the system does not qualify as a "work for hire," the employee agreement executed by Spain in 1994 effectively transferred ownership of the system from Spain to plaintiffs. This Court does not agree. Assuming the document is enforceable by Pilgrim's Pride, the successor-in-interest to ConAgra, the document pertains to works "conceived or made by me during my employment and related to the business of the Company." Plaintiffs' App. J, Hearing Exh. 15. As set forth above, the Court finds a reasonable jury likely would find Spain created the database application software primarily outside the scope of his employment with PFS, making only minor "tweaks" during working hours.

Due to the insufficiency of the evidence to establish the database software as a "work for hire," or otherwise rightfully owned by plaintiffs, the Court declines to award injunctive relief that ordinarily might be warranted by this claim.

### 4. Misappropriation of Trade Secrets

■ Count VI of the amended complaint alleges defendants misappropriated PFS trade secrets, and benefited from that misappropriation, in violation of the Iowa Trade Secrets Act, Iowa Code §§ 550.1 *et seq.* To establish their claim under Iowa law, plaintiffs must show: 1) the existence of a trade secret; 2) that the secret was

acquired as the result of a confidential relationship; and 3) unauthorized use of the secret. *See, e.g., Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997).

■ With regard to the first element, the Iowa Supreme Court has held that information constituting a trade secret can include "data on customer lists and needs, sources of supplies, confidential costs, price data and figures." *U.S. West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993). As further clarified by the court, business data and facts unique to certain customers may qualify as trade secrets by protecting "the owner's competitive edge or advantage." *Olson v. Nieman's, Ltd.,* 579 N.W.2d 299, 314 (Iowa 1998).

In the present case, Raduechel admitted that only he, Spain and Lisa Gunsolley had access to weekly profit and loss reports, *see* Plaintiffs' App. Exh. B, Raduechel Dep. at 73. Such information, if known, could allow competitors to undercut PFS' prices and steal accounts. *See* Hearing Tr. at 447–48 (Gunsolley testimony). The same is true of information concerning product mixes and market share. *Id.* The Court therefore has little trouble concluding that plaintiffs are likely to establish the first element with regard to the documents given to consultant Donohue, banker Hicks, and possibly, retained in some form by defendants on their current database. *See gen.* Plaintiffs' App. J, Hearing Exh. 16 at TD & T 124–138.[12]

The remaining two elements, whether the secrets were obtained as the result of a confidential relationship, and unauthorized use of the secrets, previously have been addressed with regard to plaintiffs' claim for breach of fiduciary duty. Clearly, Ra-

---

**12.** Plaintiffs also attempt to base this claim on defendants' use of the database application software. Due to the Court's doubts as to whether Pilgrim's Pride is in fact the rightful owner of this software, the Court declines to find the software itself constitutes a trade secret under Iowa law.

duechel's and Spain's divulgence of these financial and customer documents with Donohue and the bankers, as well as defendants' possible use of the secrets in their current operations, amounts to an unauthorized use of trade secrets.

In resisting plaintiffs' motion on this issue, defendants contend there is no proof anyone other than consultant Donohue saw the information at issue. *See* Hearing Tr. at 135 (Raduechel testimony indicating he complied with Donohue's direction not to share information with anyone else). As argued by plaintiffs in their closing memorandum, however, a reasonable jury could infer that bankers Hicks and Pothoven saw or were informed of the relevant financial information, based on Hicks' deposition testimony that the financial figures and projections contained in the business plan were critical to the banks' decision to make the loan. Plaintiffs' App. Exh. E, Hicks Dep. at 13, 35–36.

Lastly, defendants contend plaintiffs have failed to establish a specific harm resulting from the alleged use of unauthorized financial and customer data. This Court disagrees. Although plaintiffs have not yet shown conclusively that defendants are using confidential PFS data in their day-to-day operations, plaintiffs did produce evidence the confidential data was critical to defendants' ability to obtain a bank loan. Based on this evidence, a reasonable jury likely would find that the misappropriated documents enabled defendants to establish and operate their competing business. *But see Lemmon,* 559 N.W.2d at 280 (no misappropriation of trade secret absent evidence defendant appropriated information for his own list or disclosed to third party competitors). The harm D & B Solutions has caused to the Oskaloosa center was outlined previously, and need not be repeated here. Accordingly, the Court concludes plaintiffs' are

likely to succeed on the merits of their claim under chapter 550 of the Iowa Code.

### 5. Conclusion Regarding Probability of Success on the Merits

In summary, based on the record now before it, the Court finds that plaintiffs are likely to succeed on the merits of their claims for breach of fiduciary duty and misappropriation of trade secrets, at minimum. This *Dataphase* factor weighs in favor of granting preliminary relief in some form.

### B. Threat of Irreparable Harm to Plaintiffs

■ Although the Court's finding that plaintiff is likely to succeed on the merits carries considerable weight, *S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir.1992), this finding does not eliminate the need to at least consider the remaining three *Dataphase* factors. *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.,* 815 F.2d 500, 503 (8th Cir.1987). The first of the three remaining factors is whether a denial of preliminary injunctive relief will cause irreparable harm to plaintiffs.

During the final portions of the hearing on July 21, 2004, Gunsolley and Matkin testified that during their initial month of operation, defendants had succeeded in converting approximately [REDACTED]% of the Oskaloosa center's poultry business, causing the center's profits to fall from a weekly average between [REDACTED] per week to a *net loss* of [REDACTED] for the week of July 12, 2004. Hearing Tr. at 433, 496. If defendants are allowed to continue unchecked, the center's losses likely will increase, as defendants have made it no secret their intent was to convert at least 80% of the Oskaloosa center's "actual sales dollars" during D & B Solu-

tions' first year of operation. Plaintiffs' App. Tab E, TD & T 170.

Additionally, Bobby Matkin testified during the hearing that if profits fail to turn around, plaintiffs have an obligation to their shareholders to close the Oskaloosa center. Hearing Tr. at 497–500. The Court has no reason to doubt the sincerity of Matkin's testimony. Although the Court is confident plaintiffs themselves can absorb the loss of the Oskaloosa center, it has greater concern for the 27 individuals currently employed there.

Of course, preliminary relief should not be granted where a plaintiff has an adequate remedy at law. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir.1992). Even assuming plaintiffs' harm is easily calculated, however, the record shows defendants have virtually no personal assets that are not pledged to secure their vast debt, and can lawfully be executed upon by a judgment creditor. This factor therefore weighs in favor of granting preliminary relief. *See, e.g., Foodcomm Int'l v. Barry,* 328 F.3d 300, 304 (7th Cir.2003) (preliminary injunctive relief appropriate where record showed any judgment plaintiff obtained against defendants would be uncollectible); *Airlines Reporting Corp. v. Barry,* 825 F.2d 1220, 1226–27 (8th Cir.1987) (if defendants shown to be unable to satisfy eventual award of damages, preliminary injunctive relief appropriate).

### C. Balance of Harms

■ The Court must also consider the balance between this harm and potential harm to others if relief is granted. *Sanborn Mfg. Co.,* 997 F.2d at 485. Initially, the Court notes there is no doubt all five D & B Solutions employees would experience financial hardship if injunctive relief were entered against defendants. Nevertheless, the potential hardship is not insurmountable. Raduechel testified during the hear-

ing that D & B Solutions' current debt, for which Raduechel and Spain are personally liable, is limited to a $40,000 note to MidwestOne Bank, as well as a $150,000 note to Raduechel's sister and her husband. Hearing Tr. at 212. As of July 20, 2004, Raduechel estimated that D & B Solutions' accounts receivable exceeded its accounts payable by approximately $100,000. Assuming this trend has continued to date, this profit could be used to pay a large portion of the outstanding debt.

Furthermore, enjoining defendants from unlawfully competing against plaintiffs will not prevent them from obtaining other employment. *See, e.g., Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1437 (N.D.Iowa 1996) (noting defendants had "considerable work experience and ability, and thus an injunction on employment with a competitor does not leave [them] without employment prospects"). Furthermore, Spain admitted during the hearing that he likely had an outstanding offer of employment with Potthoff Foods in the event things turned sour with D & B Solutions. Balancing the brief financial setback facing five individuals against the potential layoff of 27 employees of the Oskaloosa center, the Court finds this factor weighs in favor of granting preliminary relief.

### D. Whether Injunction Serves the Public Interest

■ Finally, the Court must consider whether the issuance of a temporary restraining order serves the public interest. *Sanborn Mfg. Co.,* 997 F.2d at 485. The Court finds the public interest supports fair and lawful competition among businesses. Because defendants have not operated fully within these boundaries, the Court finds the public interest favors granting preliminary relief.

### III. CONCLUSION

For the reasons outlined above, all four *Dataphase* factors weigh in favor of granting the following preliminary relief. The Court must now consider the scope of injunctive relief to which plaintiffs are entitled. In their amended complaint and written memoranda, plaintiffs urge the Court to enjoin defendants from, among other things, working together in any capacity, employing and/or soliciting the employment of former Oskaloosa employees, soliciting and/or accepting business from PFS customers, misappropriating PFS trade secrets, and using the database software developed by Spain. Amended Complaint at ¶ 4. In addition, plaintiffs seek a forfeiture of defendants' compensation during the alleged "period of disloyalty," *see id.*, and imposition of a constructive trust on D & B Solutions revenues. *Id.* at ¶ 93. The Court has attempted to form its injunction in a manner that will eliminate the threat of irreparable harm facing plaintiffs without unreasonably preventing defendants from earning a livelihood.

Based on the Court's findings, above, the Court enjoins the above-named defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Court's order:

(1) from contacting, soliciting, hiring or employing any persons who were employed at PFS' Oskaloosa facility since November 2003, other than those individuals employed by D & B Solutions, Inc. at the time of the preliminary injunction hearing on July 20–21, 2004;

(2) from soliciting or accepting the business of entities (or individuals) which were customers of Pilgrim's Pride's Oskaloosa facility since November 2003;

(3) from soliciting or accepting the business of entities (or individuals) which were suppliers of Pilgrim's Pride's Oskaloosa facility since November 2003;

(4) from soliciting or accepting the business of trading and/or brokerage firms (or individuals) with which PFS did business since November 2003;

(5) from actual, threatened and inevitable misappropriation of plaintiffs' trade secrets. Although the Court has concluded that the database application software itself is unlikely to be found proprietary to plaintiffs, any customer data and financial information transferred to D & B Solutions, Inc. via the software system *is in fact* proprietary. Such information must be deleted from defendants' computer system and/or paper files immediately upon the effect of this injunction.

(5) from otherwise interfering with business relationships of PFS.

The Court acknowledges plaintiffs' request for the forfeiture of defendants' compensation, and the imposition of a constructive trust. Because this is a preliminary ruling, coupled with the fact plaintiffs have presented no evidence of defendants' intent to hide assets or unlawfully divert funds, the Court declines to impose either remedy at this juncture. Defendants are cautioned, however, that if evidence of unlawful conduct does surface, the Court may revise its ruling on this issue.

Rule 65(c) of the Federal Rules of Civil Procedure provides in relevant part that: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper . . . ." As noted by the district court in *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1278

(N.D.Iowa 1995), there is some uncertainty in the Eighth Circuit as to whether imposition of a bond is mandatory or discretionary. This Court, like the court in *Curtis 1000*, believes the better course is to require a bond, especially when the party seeking the injunction will have little difficulty providing the collateral to obtain such a bond. Confident the case can be brought to its completion within one year from today, the Court finds that a bond equivalent to Raduechel's and Spain's combined annual salaries with D & B Solutions, Inc., or $150,000,[13] is appropriate under the circumstances. *See id.* at 1279 (establishing bond equivalent to defendant's estimated annual salary).

IT IS THEREFORE ORDERED that the injunction set forth above shall take effect immediately upon plaintiffs' deposit with the Clerk of Court security in the amount of $150,000, and shall remain in force pending a full trial on the merits and/or further order from this Court.

IT IS FURTHER ORDERED that plaintiffs' July 19, 2004 motion to supplement the preliminary injunction record is granted. Plaintiffs' July 19, 2004 motion for default judgment is denied as moot.

IT IS ORDERED.

---

13. Spain testified during the hearing that his current salary with D & B Solutions is $75,000. Hearing Tr. at 330. The Court has been unable to locate Raduechel's testimony on the same issue, but assumes for the purpose of establishing an appropriate bond that Raduechel is being paid an equal amount.