**PFS DISTRIBUTION COMPANY and Pilgrim's Pride Corporation of Delaware, Inc., Plaintiffs,**

v.

**Darrell RADUECHEL, Barry Spain and D & B Solutions, Inc., Richard R. Donohue, Theobold, Donohue & Thompson, P.C., MidWestOne Bank & Trust, Steven P. Hicks and John Pothoven, Defendants.**

No. CIV 4–04–CV–10329.

United States District Court, S.D. Iowa, Central Division.

Jan. 8, 2007.

---

William Lynch Schaller, John M. Murphy, Peter P. Tomczak, Baker & McKenzie LLP, Chicago, IL, Michael W. Thrall, Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, IA, for Plaintiffs: PFS Distribution Company and Pilgrim's Pride Corporation of Delaware, Inc.

Gordon Fischer, Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, IA, for Defendants: Darrell Raduechel, Barry Spain and D & B Solutions, Inc.

Mark D. Walz, Stanley J. Thompson, Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, IA, for Defendants: MidWestOne Bank & Trust, Steven P. Hicks and John Pothoven.

Megan M. Antenucci, David L. Phipps, Whitfield & Eddy, P.L.C., Des Moines, IA, for Defendants: Richard R. Donohue.

Glenn L. Smith, Finley, Alt, Smith, Scharnberg, May & Craig, P.C., Des Moines, IA, for Defendants: Theobald, Donohue & Thompson, P.C.

## ORDER

LONGSTAFF, Senior District Judge.

THE FOLLOWING MOTIONS ARE NOW PENDING BEFORE THE COURT: 1) a motion for summary judgment, filed August 14, 2006 by defendant John Pothoven; 2) a motion for partial summary judgment, filed August 14, 2006 by defendants MidWest*One* Bank, Steven

P. Hicks and John Pothoven (collectively, "the Bank defendants");[1] 3) a motion for partial summary judgment, filed August 14, 2006 by plaintiffs PFS Distribution Company and Pilgrim's Pride Corporation of Delaware, Inc.'s (collectively, "plaintiffs"); and 4) a motion for summary judgment, filed August 14, 2006 by defendants Richard Donohue and Theobald, Donohue & Thompson, P.C. ("TD & T"). All motions have been resisted,[2] and are considered fully submitted.

## I. BACKGROUND

The following relevant facts either are not in dispute, or are viewed in a light most favorable to the party against whom they are asserted. If a fact at issue is relevant to a claim with regard to which cross motions are pending, the Court simply has identified the dispute.[3]

### A. PFS Distribution Company

Plaintiff PFS Distribution Company ("PFS") owns and operates a food distribution center located in Oskaloosa, Iowa ("the Center," or "PFS Oskaloosa"). PFS

---

**1.** Defendants Darrell Raduechel and Barry Spain have joined in the Bank defendants' motion and supporting documents, as well as in the resistance to plaintiffs' motion that was filed by Donohue and TD & T.

**2.** As part of their resistance to plaintiffs' motion for partial summary judgment, the bank defendants have moved to strike plaintiffs' Statement of Uncontested Material Facts ("Plaintiffs' Statement") in its entirety, or, to specify that certain facts are immaterial to the issues raised in the motion. The bank defendants argue that numerous facts included in Plaintiffs' Statement are not included in plaintiffs' brief and are not determinative to the outcome of the motion. The bank defendants also contend that many facts asserted by plaintiffs are not in actuality, "uncontested."

In the interest of judicial economy, the Court denies defendants' motion to strike Plaintiffs' Statement. And although the Court

agrees that many facts included in the Statement are irrelevant to the issues raised in plaintiffs' motion, the Court declines to specify expressly which facts it finds are immaterial. Rather, as stated at the outset of the "Background" section, the Court has confined its present review to those facts it finds are relevant to the motions under consideration.

**3.** The Court acknowledges that many of plaintiffs' proposed facts are not fully supported by the documents cited by plaintiffs in their Statement of Undisputed Facts. The same is true of defendants' respective Statements, however. Furthermore, because Raduechel and Spain admitted many allegedly unsupported allegations in their Answer to the Complaint, the Court must accept those facts which do not adversely impact the remaining defendants.

is a wholly-owned subsidiary of Pilgrim's Pride Corporation of Delaware, Inc. ("Pilgrim's Pride"). Defendant Darrell Raduechel was employed at the Oskaloosa Center between 1979 and June 2004, most recently as general manager. Defendant Barry Spain, the former sales manager, worked at the Center from 1987 until his resignation in June 2004.

The Oskaloosa Center originally was owned by a private individual, who sold it to ConAgra Poultry Company in the mid-1970s. Pilgrim's Pride, through one of its affiliates, acquired ConAgra Poultry in November 2003. At one point, approximately 30 persons were employed by the Oskaloosa Center.

Between December 2003 and early June 2004, approximately [redacted] of the Center's business involved the distribution of poultry and other meats, with the remaining [redacted] consisting of "trading" [4] and "other things." Nearly all, or [redacted] of PFS Oskaloosa's poultry and meat sales were made to [redacted] customers, with Fareway Stores representing [redacted] of these sales and Affiliated Foods representing [redacted].

For the fiscal year 2003, ending May 31, 2003, PFS Oskaloosa boasted a sales volume approximating $60–70 million, with [redacted] million in annual profits. The parties dispute whether plaintiffs ever publicly disclosed their profit margin before filing the present complaint. Plaintiff's web page, entitled "Professional Food Systems in Iowa," stated that adding a network of traders "doubled the present sales pounds from 50 million annually to around 100 million pounds as well as sales dollars from 40 million annually to about 80 million dollars annually." *See* Bank

Defendants' Appendix in Support of Partial Motion for Summary Judgment ("Bank Defendants' App.") at 78–80.

Plaintiffs kept confidential all other financial and operating information relating to PFS Oskaloosa, including the exact mix of customers, the division of its operating components and profit margins. Spain conceded during the hearing on plaintiffs' motion for preliminary injunction that he understood the sales purchasing information on PFS Oskaloosa's internal data base, as well as specific profit and loss information, was confidential.

### B. Defendant Darrell Raduechel

As set forth above, Darrell Raduechel worked for the Oskaloosa Center under its various owners from 1979 until June 2004, when he voluntarily resigned. From 1993 until his resignation, Raduechel served as the Center's general manager. As general manager, Raduechel controlled all aspects of PFS Oskaloosa's operations, and had access to all information generated by the Center.

### C. Defendant Barry Spain

Defendant Barry Spain begin working for the Oskaloosa Center in 1987. In 1994, he was named operations manager. From approximately 1996 or 1997 to June 17, 2004, Spain was the Center's sales manager, as well as its top salesman. As sales manager, Spain personally serviced more than 75% of PFS Oskaloosa's poultry and meat business. All Center employees, other than the accounting staff and the office manager, reported to Spain. Furthermore, Spain was in charge of the Center's

---

4. The "trading" business consisted of independent traders who purchased and re-sold poultry and other meat products backed by PFS' credit, with the Oskaloosa facility paying the suppliers and then billing the customers. Upon receiving payment from the customers, the Oskaloosa facility would then split the profits with the traders.

computer systems at all times relevant to this action.

### D. Access to PFS Material

During all time relevant to this action, employees of PFS Oskaloosa had access to corporate financial information on a need-to-know basis. Raduechel had access to numerous documents in his role as general manager of the facility. Spain also had access to weekly profit and loss statements and sales information.

As a condition of their employment when the Center was owned by ConAgra, all office employees-including Raduechel and Spain-entered into confidentiality agreements, prohibiting them from using or disclosing any of the business' confidential information. It is unclear whether these agreements remained binding when plaintiffs purchased the business from ConAgra.

MidWest*One* Bank & Trust in Oskaloosa ("MidWest*One* ") also had access to certain PFS financial information. Since 1975, PFS and its predecessor, ConAgra, maintained a "sweep" account at MidWest*One*. Typically, PFS Oskaloosa would receive checks from its customers, and would either send them to corporate headquarters for deposit in the headquarters' primary bank or would deposit the checks the same day they were received into the "sweep" account at MidWest*One*. In the latter instance, MidWest*One* would then "sweep" the funds out of the account at the end of each day to the primary bank used by corporate headquarters.

### E. Raduechel and Spain Discuss New Venture

Soon after Pilgrim's Pride's November 2003 acquisition of ConAgra Poultry, Raduechel learned that Pilgrim's Pride was considering making changes to the compensation system that could significantly reduce his income as general manager. In January 2004, Raduechel approached Spain about joining him in a new venture. This new business, to be based in Des Moines, Iowa and called "D & B Solutions," would compete directly with the Oskaloosa Center.

### F. Raduechel's and Spain's Initial Meeting with Pothoven

That same month, Raduechel and Spain met with defendant John Pothoven, president of MidWest*One*, to discuss financing for D & B Solutions. Raduechel and Spain walked into Pothoven's office after they had unsuccessfully looked for defendant Steven Hicks, the Bank's executive vice president, upstairs. Raduechel and Spain told Pothoven that they were thinking about starting their own business, and wondered whether Pothoven's bank would help finance their venture. Although Raduechel and Spain did not give Pothoven any details about the type of business they were considering, Pothoven assumed it would be something similar to PFS Oskaloosa.

Pothoven informed Raduechel and Spain that he was not on the lending side of the bank, but nevertheless told them what MidWest*One* would require before loaning money. Specifically, Pothoven told Raduechel and Spain that they would need a business plan, financial projections, individual financial statements and tax returns, as well as a description of how they were going to capitalize the company. Upon Raduechel's and Spain's request, Pothoven recommended several professionals who could help the men develop the needed documents. Among the professionals was defendant Richard Donohue, a certified public account and chief executive officer of TD & T in Oskaloosa. Donohue, along with Pothoven and Hicks, is a member of the Board of Directors of MidWe-

st*One* Financial Group, the publicly-traded holding company that owns MidWest*One* Bank.

Hicks then walked into Pothoven's office. Pothoven suggested that Raduechel and Spain work directly with Hicks, who is chairman of MidWest*One*'s loan officer committee. Raduechel and Spain indicated they had a few issues to resolve prior to making a final decision, and the meeting ended with the understanding that Raduechel or Spain would contact the Bank if they wanted to further pursue the loan.

The meeting was short, lasting only about 20 minutes. Pothoven and Hicks knew that Raduechel was the senior manager of PFS Oskaloosa, and that Spain was an employee of the Center. The men did not discuss specific financial or lending needs, however, nor did Raduechel or Spain provide any documents to the Bank during this first meeting.

Pothoven had no additional communications with Raduechel, Spain or Hicks concerning a loan request until nearly a month later. In mid-February 2004, Raduechel arranged a second meeting at MidWest*One* to take place on February 20, 2004. It is unclear who Raduechel spoke with at the Bank to schedule the meeting, but the parties agree Raduechel was told that Hicks would be handling the loan, and should definitely be present at the meeting.

G. Preparation of and Review of Business Plan

Donohue first met with Raduechel and Spain about D & B Solutions at TD & T's offices on January 27, 2004.

At some point during this meeting, Raduechel informed Donohue that he was the general manager, and that Spain was the sales manager of PFS Oskaloosa. Donohue understood that Raduechel and Spain

hoped some PFS Oskaloosa customers would choose D & B Solutions as their poultry supplier. He also understood that Raduechel and Spain had communicated with existing PFS Oskaloosa employees about the possibility of joining D & B Solutions. Donohue maintains, however, that he specifically asked whether any PFS Oskaloosa employees were subject to non-compete agreements, and was told that Raduechel and Spain were working with legal counsel on that issue.

During the January 27, 2004 meeting, Donohue, Spain and Raduechel discussed developing a business plan and calculating financial projections. Donohue provided a table of contents to enable Raduechel and Spain to prepare their own business plan and financial projections. Donohue denies knowing that Raduechel and Spain would use plaintiffs' financial information to create their financial projections. Rather, he assumed the men would rely on their general knowledge of the industry, admittedly gained while working for the center, to develop the necessary projections.

Raduechel and Spain provided Donohue with documents containing detailed information about plaintiffs' financial performance, including the following: PFS Oskaloosa's Operating Statement for fiscal year 2003, PFS Oskaloosa's Gross Profit Analysis for fiscal year 2003, a revenue and profit report for PFS Oskaloosa's trading business and trucking business covering 2002, 2003 and part of fiscal year 2004, PFS Oskaloosa's calendar year 2003 Customer Produce Analysis Report for Fareway Foods, PFS Oskaloosa's calendar year 2003 Customer Produce Analysis Report for Affiliated Foods, PFS Oskaloosa's balance sheet for the period ending May 2003 and PFS Oskaloosa's income statement for the period ending May 2003. Donohue called Raduechel and expressed concern about whether he had the authority to

disseminate the information. Raduechel asked Donohue to return the documents, but Donohue apparently forgot to do so, and left the documents in his file.

Donohue denies preparing the business plan or financial projections, or otherwise contributing to the contents of the business plan. Donohue also denies that the men discussed the specific sources Raduechel and Spain would use in order to prepare their projections.

Plaintiffs claim that based on the number of hours Donohue spent on the D & B Solutions project, it is unreasonable to believe Donohue did not draft or significantly revise the business plan. Over the next several weeks, Donohue had three separate conferences and one teleconference with Raduechel and/or Spain. Donohue's deposition testimony, as well as TD & T invoices to D & B Solutions, indicate that between February 10, and February 19, 2004, Donohue spent approximately 10 hours in discussion with Raduechel and/or Spain, or reviewing drafts of the D & B Solutions business plan.

Donohue testified in deposition that he understood that Raduechel's and Spain's actions *could* have adverse consequences for PFS Oskaloosa:

Q. I'm asking: Did you understand that what they were doing, that is what Barry Spain and Darrell Raduechel were doing, was adverse to the interests of PFS Distribution company?

A. Well, if those two customers followed it would be adverse, yes.

Q. And if those employees followed, it would be adverse, and if Mr. Spain and Mr. Raduechel themselves left it would be adverse; correct?

A. Yes.

Q. Their objective was to, according to the financial projections, take 80 percent of PFS Distribution Company's sales; correct?

A. That was their Yep. That was their business plan, yep.

Plaintiff's App. at 521–22.

Donohue made notes with respect to his discussions with Raduechel and Spain. Among his writings are the following notations:

— "Problem with releasing ConAgra info on which these amounts [financial projections contained in Raduechel's and Spain's business plan] are based."

Plaintiffs' App. at 232.

— "Use of ConAgra divisional info a problem w/confidentiality of ConAgra who has not authorized its release."

*Id.* at 241.

— "Projections based upon same customers over many years of history ...."

*Id.* at 232.

— "Risks [are] Pilgrim [sic] coming after [D & B Solutions] + low balling to get customers to stay with them."

*Id.* at 231.

— "If done suddenly can PFS get someone to run business opportunity[?]"

*Id.*

— "Will not take employee group until know customers will follow and operation will work."

*Id.* at 231.

—"How much assurance can you get that they will sign on as a customer[?]"

*Id.* at 234.

— "Pilgrim will come hard to protect investment—Anticipate immediate legal action."

*Id.* at 241. Donohue stated in deposition that he was concerned that PFS would respond to the new competition by drastically reducing prices in order to lure clients away from D & B. To explain his

note suggesting PFS would initiate legal action, Donohue stated he was referring to the noncompete agreements, which he believed were being reviewed by legal counsel.

In preparing the business plan, Spain testified that he and Raduechel based their financial projections on general knowledge and estimates of current PFS Oskaloosa sales. The information provided to the Bank showed Gross Sales to be $50,075,000.00 and Cost of Goods Sold ("COGS") as [redacted]. PFS actual sales for 2003 were [redacted], and actual COGS was [redacted].

The business plan contained in Donohue's work files states as follows: 1) that Raduechel's and Spain's projections "are based on actual sales of 'PFS' over the last two years;" 2) that the "sales dollars" "projected in our financial plan represent[s] 80 percent of [PFS Oskaloosa's] actual sales dollars of last year;" and 3) makes specific reference to plaintiffs' gross margin information. Plaintiffs' App. at 361. The plan further states: "We have used a more conservative figure in our first year of operation of [redacted]." Plaintiffs' App. at 361.

The business plan identifies Brian Imhoff, Gregg Robbins and Jeff Steen as members of the new firm's "[t]eam." *Id.* at 547–51. Only Greg Robbins is clearly identified as a current PFS employee, however. The plan notes the following "Key Issue:" "What will Pilgrim's Food System['s] reaction be to losing all key personnel[?]" *Id.* at 558.

The business plan also states as follows: "Poultry sales makes up about [redacted] of our business and our two major accounts makeup [redacted] of the poultry sales. Without our two major poultry sales accounts, [PFS Oskaloosa] can only operate on [redacted] of [its] total current business!"

*Id.* at 560. Raduechel told Donohue that D & B intended to take 80% of the Oskaloosa business

### H. Meetings with MidWest*One* Personnel

Raduechel, Spain and Donohue met with Pothoven on February 20, 2004. Hicks was unavailable on that date and time.

The parties dispute whether Donohue, Raduechel and Spain informed Pothoven that they had prepared a business plan and financial projections during this meeting, and/or showed Pothoven portions of the plan. According to Pothoven, the meeting was brief: "Barry and Darrell said our plans are that we're going to put a business plan together and we will be back for a loan. And that's about all I remember." Pothoven App. at 21. Donohue described the meeting as follows:

> It was a very loose discussion about possible financing, what they were thinking about doing. I don't know whether they gave Pothoven that business plan, or not. I assume they probably gave [Pothoven] some version of it. Again, it didn't take long. Probably half the meeting was just chitchatting, all of the good stuff, you know.

Plaintiff's App. at 526. Raduechel states only that he showed "MidWest*One*" a version of his business plan during the meeting, and that the plan clearly stated that the projections were based on the PFS Oskaloosa numbers.

Pothoven did not talk to Hicks about the proposed venture between the January and February meetings, nor did he talk to Raduechel or Spain after the February meeting for any purpose. At some point thereafter, Hicks told Pothoven that Raduechel and Spain would be operating their business out of Des Moines, and that

MidWest*One* might make a loan to Spain to purchase a home in Des Moines.

Raduechel and Spain met with Hicks on February 27, 2004, and provided Hicks with a copy of the business plan and financial projections. It is not clear which version of the plan was provided to Hicks. The men provided additional information and/or updates to Hicks on or about March 9, 2004.

Hicks also was aware of Raduechel's and Spain's calculation that Fareway Stores and Affiliated Foods constituted [redacted] percent of PFS Oskaloosa's poultry sales, which was "[redacted] percent of their business." *Id.* at 470–71. Hicks prepared a "Loan Presentation Summary," dated April 15, 2004, which contained the following statements:

— D & B has supplied the bank with a weekly cash flow for the first year, a summary of the initial capital expenditures, and other support documentation on lease payments. The figures [i.e. financial projections] used are based off of the experience of Barry and Daryl over the past 15 years with ConAgra and PFS.

— The original cash flow estimates include sales volumes from the two major accounts totaling [redacted] plus some other smaller accounts.

— COGS is estimated at [redacted]. Actual COGS experience is a few points less, so the projected figure is conservative. This includes transportation costs of [redacted] cents per pound shipping on incoming freight.

— Expense figures, accounts receivable aging, and accounts payable aging are based on past experiences. Salaries and benefits are set based on a fully staffed operation.

Plaintiffs' App. at 563.

Hicks' April 15, 2004 Loan Presentation Summary also states:

Poultry sales are expected to make up [redacted] of [D & B Solutions'] business with the possible engagement of two accounts [Fareway Stores and Affiliated Foods] who would make up [redacted] of that [redacted] .... Current Management [Raduechel and Spain] feels that the two larger accounts would more than likely move [with] them when they break off from PFS.

. . . .

Other employees pegged as potential employees who *may* be willing to move with the two new owners once the business is opened include: Brian Imhoff (Logistics Manager—16 years), Greg Robbins (Safety Manager—14 years), and Jeff Stein (Warehouse Manager— four years).

*Id.* at 562 (emphasis added).

In May 2004, MidWest*One* Bank provided D & B Solutions with commitments for a $400,000 revolving line of credit to fund inventory and accounts receivable, a $40,000 term note to fund the purchase of equipment, fixtures, furniture and start-up costs, and an $80,000 straight line of credit. The $40,000 term note since has been repaid in full, through the bank's collection of D & B Solutions' receivables.

I. Recruitment of PFS Oskaloosa Staff

Meanwhile, as set forth in their business plan, Raduechel and Spain knew they would need to hire experienced employees to ensure their rival business was a success. In January 2004, Raduechel asked Lisa Gunsolley, the center's office manager, if she would join D & B Solutions. Gunsolley was fearful that PFS Oskaloosa would go out of business if the majority of their customers went with Raduechel and Spain.

Raduechel told Gunsolley that he was offering jobs to several other employees of PFS Oskaloosa. In fact, as of April 26, 2004, Raduechel and Spain had extended job offers to five or six current employees. Two PFS Oskaloosa employees, Victor Scavo and Brian Imhoff, even helped Raduechel and Spain find warehouse and office space in Des Moines while all three were still under plaintiffs' employ.

### J. Solicitation of PFS Oskaloosa Customers

At the time Raduechel and Spain were contemplating a new business, Affiliated Foods was one of PFS Oskaloosa's customers, representing [redacted] of the center's poultry sales. The undisputed facts show that Raduechel met with a representative of Affiliated Foods during March or early April 2004. During their conversation, Raduechel told the representative he had not yet signed a contract with PFS, and was considering starting his own business. He then asked the representative whether Affiliated Foods would do business with his company in the event Raduechel and Spain did open a new firm. The evidence shows that Affiliated Foods began purchasing chicken from D & B Solutions in July 2004.

Fareway Stores was the Center's largest customer during this same time period, accounting for [redacted] of PFS Oskaloosa's poultry sales. Rodney Nedved, a meat buyer for Fareway Stores, testified in deposition that Fareway Stores strongly preferred buying Sanderson Farms poultry products.

One or two months before resigning from PFS Oskaloosa, Spain told Nedved that PFS Oskaloosa wanted to sell more Pilgrim's Pride chicken, and that he could not guarantee that the center could get Sanderson Farms products in the future. The parties dispute whether Spain's representation was in fact correct. What is clear, however, is that Spain assured Nedved that Raduechel's and Spain's *new business* could guarantee the availability of Sanderson chicken.[5]

On June 10, 2004–five days before announcing his resignation-Spain sent an e-mail from the account *"barry@pfsiowa. com"* to poultry client Thoms Proestler. At that time, Spain expected his last day of work at the Oskaloosa Center would be Tuesday, June 22, 2004, and that he would be working at D & B Solutions on Wednesday, June 23. In his e-mail, Spain told Thoms Proestler that he would fax a price list on June 23 on behalf of D & B Solutions, and that there would be "no changes" from PFS Oskaloosa's pricing for products delivered by D & B Solutions during the week beginning Monday, June 28. Spain wanted Thoms Proestler to begin placing orders with D & B Solutions on Thursday, June 24, for delivery beginning Monday, June 28, and promised that Thoms Proestler's "transition" from PFS Osklaloosa to D & B Solutions would be "totally seamless." Plaintiffs' Statement, ¶ 95.

Spain also admitted informing other Oskaloosa Center customers of his proposed new business. There is no evidence, however, that Spain directly solicited business from these customers prior to leaving PFS Oskaloosa.

### K. Solicitation of Poultry Suppliers

In March 2004, Spain met with a representative of poultry supplier Sanderson Farms and told him that he and Raduechel

---

**5.** The evidence shows that Fareway Stores began purchasing chicken from D & B Solu-

tions on or about June 24, 2004.

were thinking of starting a new business, Spain asked the representative whether, in the event they followed through on their plans, Sanderson Farms would sell to their new business.

At some point before resigning from PFS Oskaloosa, Raduechel had similar conversations with representatives from George's Farms, which supplied the poultry that Affiliated Foods purchased from the Oskaloosa Center, and GoldKist, another poultry supplier. There is no evidence any of the three suppliers could not supply both PFS Oskaloosa and the new venture, however. In fact, Raduechel specifically asked the George's Farms representative whether his new business would *also* be able to purchase poultry from George's Farms.

### L. Notice of Resignations and Destruction of Computer Files

On April 26, 2004, Raduechel sent the following e-mail to members of his family:

> Mom had called to see where I was on my new business venture. Here are the latest developments. The bank gave us the final approval of our loan on Friday afternoon so we now have our money secured. Our next step will be to get back together with our lawyer in Des Moines to set up a time table. I am under contract with Pilgrim's until May 30th so I have to be extremely careful of what I do and say prior to that time as far as talking to customers and employees. My lawyer advises me that I have every right to pursue other interests but I have to be careful using Pilgrim's time and money doing it.

Plaintiffs' App. at 590.

On Monday, June 7, 2004, Raduechel provided PFS with notice of his resignation, which was to take effect on Friday, June 18, 2004. Spain submitted his resignation on Tuesday, June 15, 2004, stating that his last day of work would be Tuesday, June 22, 2004.

On Friday, June 11, 2004, Spain moved a series of files from Raduechel's computer at PFS Oskaloosa to Lisa Gunsolley's office computer. He then deleted the remaining data, and to make sure deleted information could not be retrieved with forensic tools, ran a "defrag" program.

Spain contends he moved and/or deleted the files because he was preparing Raduechel's computer for permanent shut down. Both Spain and Gunsolley testified that Raduechel's computer allegedly had been experiencing problems and was going to be replaced. Spain further contends that at the time he performed these functions, he was still unsure as to whether he was leaving PFS Oskaloosa.

### M. Alleged Damages

Plaintiffs first learned of Raduechel's and Spain's intentions to form D & B Solutions on June 8, 2004, when PFS management traveled to Oskaloosa to investigate Raduechel's resignation. Immediately after Raduechel's and Spain's departures from PFS, the Oskaloosa center lost approximately [redacted] of its poultry and meat business to D & B Solutions, including Fareway Stores and Affiliated Foods. PFS Oskaloosa has since been able to "recapture" all of the customers who initially did business with D & B Solutions other than Affiliated Foods and Fareway Stores. Fareway Stores now purchases its poultry directly from Sanderson Farms, and Affiliated Foods began purchasing its poultry directly from George's Farms.

### N. Present Action.

Plaintiffs filed the present action and request for injunctive relief on June 21, 2004, alleging that Raduechel, Spain, and

D & B Solutions, Inc. breached their fiduciary duties to plaintiffs by conspiring to engage in a competing business while still under plaintiffs' employ. On August 11, 2004, following an evidentiary hearing, this Court entered a preliminary injunction enjoining Raduechel, Spain, D & B Solutions and related parties and agents as follows:

(1) from contacting, soliciting, hiring or employing any persons who were employed at PFS' Oskaloosa facility since November 2003, other than those individuals employed by D & B Solutions, Inc. at the time of the preliminary injunction hearing on July 20–21, 2004;

(2) from soliciting or accepting the business of entitles (or individuals) which were customers of Pilgrim's Pride's Oskaloosa facility since November 2003;

(3) from soliciting or accepting the business of entities (or individuals) which were suppliers of Pilgrim's Pride's Oskaloosa facility since November 2003;

(4) from soliciting or accepting the business of trading and/or brokerage firms (or individuals) with which PFS did business since November 2003;

(5) from actual, threatened and inevitable misappropriation of plaintiffs' trade secrets.

. . .

(6) from otherwise interfering with business relationships of PFS.

*PFS Distribution Co. v. Raduechel,* 332 F.Supp.2d 1236, 1252 (S.D.Iowa 2004).

Plaintiffs amended their complaint on January 27, 2005, adding as defendants MidWest*One* Bank & Trust, Steven P. Hicks, John Pothoven, Richard R. Donohue and Theobald, Donohue & Thompson, P.C.

On March 15, 2005, defendants MidWest*One*, Hicks and Pothoven filed a combined motion for summary judgment, claiming they did not knowingly assist, participate or conspire in any unlawful conduct committed by Spain or Raduechel, and should not be responsible for the two men's actions. In an Order entered September 20, 2006, this Court denied the motion, finding numerous factual issues regarding the extent of bank representatives' knowledge of Raduechel's and Spain's actions.

## II. APPLICABLE LAW AND DISCUSSION

### A. Governing Law

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). In reviewing the summary judgment record, a court must give the non-moving party the benefit of all reasonable inferences, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.,* 266 F.3d 884, 885–86 (8th Cir.2001). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reason-

able jury to return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B. Outline of Relief Sought

Defendants Donohue, TD & T and Pothoven have moved for summary judgment with respect to all of plaintiffs' claims. The Bank defendants have moved for partial summary judgment with respect to plaintiffs' claim for misappropriation of trade secrets in violation of the Iowa Trade Secrets Act, I.C.A. §§ 550.1 *et seq.* (count VI of the second amended complaint). Defendants Raduechel and Spain have joined the Bank defendants motion with regard to count VI. In light of the Court's prior orders, the Bank defendants, other than Pothoven, and defendants Raduechel and Spain are not seeking summary judgment as to the remaining claims against them.

In their cross-motion for summary judgment, plaintiffs seek the following relief:

-partial summary judgment against defendant Raduechel on liability as to plaintiffs' claim for breach of fiduciary duties (count I);

-partial summary judgment against defendant Spain on liability as to plaintiffs' claim for breach of fiduciary duties (count II);

-partial summary judgment against all defendants on liability as to plaintiffs' claim for conspiracy to breach fiduciary duties (count III);

-partial summary judgment against Midwest*One* Bank on liability as to plaintiff's claim for unjust enrichment (count VI);

-partial summary judgment against all defendants other than Pothoven on lia-

bility as to plaintiffs' claim for misappropriation of trade secrets (count VI);

-partial summary judgment against all defendants on liability as to plaintiffs' claim for aiding and abetting breach of fiduciary duties (count VII); and

-partial summary judgment against all defendants, on proximate cause, on each of the foregoing claims.

The Court will consider the various arguments and relief sought with regard to each count.

### C. Breach of Fiduciary Duty

■ Counts I and II of the second amended complaint allege that Raduechel's and Spain's conduct in the approximately six-month time preceding their departure from PFS Oskaloosa breached fiduciary duties each owed to the company. Second Amended Complaint at ¶¶ 102–111. The law governing this claim was discussed in detail in this Court's preliminary injunction order. *See generally PFS Distribution Co. v. Raduechel,* 332 F.Supp.2d 1236 (S.D.Iowa 2004). Briefly, the Iowa Supreme Court has held that an employer-employee relationship can give rise to a fiduciary duty of loyalty, and that an employee could be held liable for breach of fiduciary duty in situations of "direct competition, misappropriation of profits, property, or business opportunities, trade secrets and other confidences." *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 599 (Iowa 1999). The key is whether the breach committed by the employee resulted in "substantial assistance to the competitor." *Id.* at 600. (citing *Cameco, Inc. v. Gedicke,* 157 N.J. 504, 724 A.2d 783, 789 (1999)).

Based on the evidence presented in the preliminary injunction proceedings, the Court had no trouble concluding in its August 11, 2004 order that "each man both owed and repeatedly breached his duties

to PFS between January and early June 2004." *PFS Distribution Co.,* 332 F.Supp.2d at 1244–45. No additional evidence has been presented that would cause the Court to alter this finding.[6]

1. Darrell Raduechel

■ With regard to Raduechel, the undisputed facts show Raduechel managed all aspects of PFS Oskaloosa, and was entrusted with access to all customer data and financial information generated by the Center. Plaintiffs' Statement of Undisputed Material Facts ("Plaintiffs' Statement"), ¶ 27. Furthermore, he was party to a confidentiality agreement, albeit with ConAgra, and made sure other employees signed confidentiality agreements as well. Plaintiffs' Statement, ¶¶ 32–33. As summarized in the preliminary injunction order: "The fact Raduechel signed first a conflict of interest agreement, and later a confidentiality agreement, and *supervised other employee's execution* of similar confidentiality agreements confirms that Raduechel was well aware of the need to guard proprietary information."[7] *PFS Distribution Co.,* 332 F.Supp.2d at 1245.

There is likewise an absence of material fact as to whether Raduechel breached his common law duty of loyalty to plaintiffs. As early as mid-January 2004, Raduechel began talking with other Oskaloosa center employees about beginning a rival firm. Plaintiffs' Statement, ¶¶ 62 (Spain); 65 (Gunsolley); *see Porth v. Iowa Dep't of Job Service,* 372 N.W.2d 269, 273 (Iowa 1985)

(employee breached duty of loyalty by soliciting staff to join competing firm while employed by former employer).

The parties dispute whether Raduechel expressly solicited clients of the Oskaloosa Center while still under plaintiffs' employ, or simply spoke hypothetically about his future plans. There is no dispute, however, that soon after enlisting Spain's participation, Raduechel began meeting with the bank defendants and Donohue to arrange financing for D & B Solutions. *See generally* Plaintiffs' Statement, ¶¶ 103–106 (Pothoven); 118–19 (Donohue). Perhaps most importantly, the undisputed facts show Raduechel shared several proprietary documents with Donohue, *see id.,* ¶ 143. He also included proprietary financial information in the business plan for D & B Solutions, which was shown to Donohue, Pothoven and Hicks. *Id.,* ¶¶ 142, 146–47.

The Iowa Supreme Court has held that an employee/fiduciary considering resignation generally may arrange to begin a competing venture prior to termination without violating his fiduciary duties. *Midwest Janitorial Supply Corp. v. Greenwood,* 629 N.W.2d 371, 375 (Iowa 2001). To avoid violating his common law duties, however, the employee/fiduciary *may not* "make use of confidential information peculiar to the corporation's business and acquired therefrom." *Id.*

2. Barry Spain

■ Count II of plaintiff's second amended complaint raises a parallel cause

---

6. Neither Raduechel nor Spain chose to file a separate resistance to plaintiffs' motion for summary judgment. Rather, they collectively joined in the resistance filed by Donohue and TD & T.

7. An issue exists as to whether PFS, a successor corporation, may enforce the confidentiality agreement signed by Raduechel in 1994, when ConAgra Poultry owned the Oskaloosa center. As explained in the preliminary in-

junction order, however: "Regardless of whether Raduechel, or Spain, were *contractually* bound to conceal proprietary information, the Court finds they were bound to do so under common law. The fact both men executed confidentiality agreements simply enforces the fact they knew the importance of nondisclosure." *PFS Distribution Co.,* 332 F.Supp.2d at 1245 n. 9.

of action for breach of fiduciary duty against defendant Spain. Second Amended Complaint at ¶¶ 107–11. The undisputed facts show that in the six months prior to the formation of D & B Solutions, Spain was the sales manager for PFS Oskaloosa, with "approximately everybody other than the accounting staff and the office manager" reporting to him. Plaintiffs' Statement, ¶ 36; Plaintiffs' App. at 268. He also was in charge of the center's computer systems. Plaintiffs' Statement, ¶ 40. Consistent with the conclusion reached in the preliminary injunction order, the Court finds as a matter of law that Spain's "unique access to salaries of those individuals who reported to him, as well as specific customer sales data and preferences" contained in computer files to which he had access, gave rise to a fiduciary duty of loyalty to PFS Oskaloosa. *PFS Distribution Co.,* 332 F.Supp.2d at 1246; Plaintiffs' App. at 129–30 (Spain testified he was personally responsible for 12 poultry accounts, and developed and managed software used to price customer orders).

The undisputed facts also lead to the conclusion that Spain breached his fiduciary duties "by engaging in much of the same conduct found unlawful with regard to Raduechel." *PFS Distribution Co.,* 332 F.Supp.2d at 1246. The evidence has not changed significantly with regard to this issue from the evidence presented during the preliminary injunction hearing. First, Spain admitted downloading "proprietary and confidential information" belonging to PFS Oskaloosa onto a floppy disk and taking it to his residence. Plaintiffs' App. at 153(6)—(7). He and Raduechel then incorporated proprietary financial information into the draft of the business plan for D & B Solutions that was shared with Donohue, Pothoven and Hicks. Plaintiffs' Statement, ¶¶ 142, 146–47.

It is further undisputed that Spain helped Raduechel recruit Oskaloosa Center employees to join them at D & B Solutions while Spain was still employed by PFS. *See, e.g.,* Donohue and TD & T Responses to Plaintiffs' Statement, ¶¶ 71–81, in which Raduechel and Spain have joined. Lastly, although it is not clear when Spain informed his major client, Fareway Stores, of his intent to leave PFS Oskaloosa and form a rival firm, the undisputed facts show he wrote an e-mail to poultry client Thoms Proestler on June 10, 2004, confirming that "Spain had already begun transferring Thoms Proestler's business to D & B Solutions, and would do so at PFS' pricing levels." *PFS Distribution Co.,* 332 F.Supp.2d at 1247; Plaintiffs' Statement, ¶ 95. As found earlier by this Court: "The fact Spain acknowledged that ultimately, it was the client's choice whether to transfer their business to D & B Solutions does not change the fact Spain blatantly sought to steal business while employed by PFS." *PFS Distribution Co.,* 332 F.Supp.2d at 1247. The Court finds that no material fact exists as to whether, in engaging in the above conduct, Spain breached fiduciary duties he owed to his then employer, PFS Oskaloosa. Plaintiffs' motion for summary judgment is granted with regard to count II of the second amended complaint.

### D. Civil Conspiracy

Count III of plaintiffs' second amended complaint alleges that the conduct giving rise to Raduechel's and Spain's breaches of fiduciary duty and alleged misappropriation of financial trade secret information also supports a claim for civil conspiracy against all defendants. Second Amended Complaint at ¶¶ 112–19. Pothoven, Donohue and TD & T seek summary judgment in their favor on this count, with plaintiffs cross-moving for summary judgment in their favor as against *all* defendants.

To establish a claim of civil conspiracy under Iowa law, one must show "an agreement [existed] between [two or more] persons to commit a wrong against another. The agreement must involve some mutual mental action coupled with an intent to commit the act that causes injury." *Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994).

### 1. Defendants Raduechel and Spain

As explained by the Iowa Supreme Court in *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002): "Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action. . . . Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert." (internal citation omitted). Because the Court has granted summary judgment in favor of plaintiffs on counts I and II, above, there is no need to address independently whether Raduechel and Spain also conspired to engage in the same conduct.

### 2. Bank Defendants

There is no dispute that the advice and financing Raduechel and Spain received from the bank played an important, if not necessarily critical, role in helping them form D & B Solutions. Whether the bank knew that what Raduechel and Spain were doing was unlawful when it provided its assistance is less certain, however. This latter issue is crucial to plaintiffs' claim against the bank defendants. *See, e.g., Ezzone*, 525 N.W.2d at 394–98 (upholding civil conspiracy claim against bank despite bank's claim that it believed fiduciaries had consent to control business).

The Court previously declined to grant summary judgment in favor of the bank on this claim, finding material issues of fact existed regarding the bank's knowledge of Raduechel's and Spain's actions. *See* September 20, 2005 Order at 14–15. At that time, the primary fact in dispute was whether the bank defendants knew the financial information received from Raduechel and Spain on an Excel spreadsheet was in fact actual PFS Oskaloosa data, or whether defendants genuinely believed the figures were compiled from Raduechel's and Spain's "general experiences." *Id.* at 5.

Plaintiffs have presented no new facts that would cause the Court to revisit this issue. That one of the draft business plans-which may or may not have been shown to Hicks-states that sales dollars "are based on actual sales of Professional Food Systems (PFS) over the last years," *see* Plaintiffs' App. at 361, does not establish as a matter of law the Bank defendants *knew* confidential PFS information was used, and that Raduechel and Spain had no legal right to use the data. *See* discussion with regard to count VI, below. Plaintiffs' motion for summary judgment is denied on count III with regard to the bank defendants.

### 3. Pothoven

As with the other bank defendants, plaintiffs' case against Pothoven turns on the precise information given to him, and whether Pothoven knew this information was secret and proprietary, and would therefore hurt plaintiffs if used against them.[8] The undisputed facts show that Pothoven first met with Raduechel and

---

8. Because Pothoven did not help the men prepare the business plan, the focus of the Court's discussion on this count as against Pothoven is on whether Pothoven conspired with plaintiffs to misappropriate trade secrets.

Spain at the Bank in January 2004, *see* Plaintiffs' Statement, ¶¶ 103, and again with Raduechel, Spain and Donohue on February 20, 2004. *Id.,* ¶ 144. Both meetings were brief. *See* Bank Defendants' Appendix in Support of Partial Summary Judgment ("Bank App.") at 2, 19 (describing January meeting); Pothoven Appendix in Support of Motion for Summary Judgment ("Pothoven App.") at 21 ("Barry and Darrell said our plans are that we're going to put a business plan together and we will be back for a loan. And that's about all I remember."). Pothoven vehemently denies being informed that a business plan existed or that any financial projections were prepared. Bank App. at 128. He also denies receiving any documents or other financial information. *Id.* at 124.

Plaintiffs attempt to create a material issue of fact with regard to Pothoven's involvement in the scheme by pointing to Raduechel's testimony that he showed "MidWest*One*" a version of his business plan during the meeting, and that the plan clearly stated that the projections were based on the PFS Oskaloosa numbers, Plaintiffs' App. at 222, Plaintiff's argument is unpersuasive. Nowhere in Raduechel's testimony does he state he showed *Pothoven* a version of his business plan. In fact, it is not even clear from Raduechel's testimony *when* he provided "MidWest*One*" with a copy of his plan. *See* Plaintiffs' App. at 222. The only remaining evidence that Pothoven saw a version of the business plan is Donohue's statement that he "assumed" Raduechel and Spain gave Pothoven "some version" of the plan. Plaintiff's App. at 526.

Without more, Donohue's "assumption" clearly is insufficient to establish as a matter of law that Pothoven knowingly entered into an agreement with Raduechel and Spain to assist the men in breaching their fiduciary duties and/or misappropriating plaintiffs' trade secrets. Plaintiffs' motion for summary judgment on count III is denied with regard to John Pothoven. Moreover, because plaintiffs were able to produce only a "scintilla" of evidence in response to Pothoven's properly supported motion, Pothoven's motion for summary judgment is granted on count III. *See, e.g., F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997) ("Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; a nonmovant must present more than a scintilla of evidence and must advance specific facts to create a *genuine* issue of material fact for trial.") (emphasis added) (internal quotation omitted).[9]

### 4. Donohue and TD & T

Plaintiffs' case against Donohue, and vicariously, TD & T, also turns on Donohue's knowledge of Raduechel's and Spain's conduct.[10] Unfortunately for Donohue, the undisputed facts show he had greater access to PFS documents and financial infor-

---

**9.** In their combined resistance to defendants' motions for summary judgment, plaintiffs suggest: "It is possible, of course, that Pothoven—himself a professional fiduciary as President of Midwest*One* Bank & Trust and a director of publicly-traded Midwest*One* Financial Group—was too dense to understand that Raduechel and Spain needed a loan in order to destroy their employer, in flagrant breach of their fiduciary duties." Plaintiffs' Resistance Memorandum at 7. This unsupported assertion is extremely unprofessional.

Further such attacks on an individual defendant's character will not be tolerated by this Court.

**10.** For purposes of this motion, the parties do not attempt to distinguish between Donohue and TD & T. As Donohue's employer and presumed party to the unwritten consulting contract with Raduechel and Spain, TD & T, in effect, "stands in the shoes" of Donohue.

mation, making it difficult to show he was unaware of Raduechel's and Spain's alleged breaches in fiduciary duty, and accordingly, that Donohue did not knowingly enter into an agreement to help form a business that would hurt PFS Oskaloosa.

First, as of January 27, 2004, Donohue was aware Raduechel was the general manager of PFS Oskaloosa and that Spain was the center's sales manager. Plaintiffs' Statement, ¶ 120. From this information, a reasonably jury could conclude a businessman with Donohue's background was at least subconsciously aware that the men owed a certain duty of loyalty to their employer, whether or not the men were directors or officers of PFS.

Donohue also testified he was aware that Raduechel's and Spain's intentions were to take with them 80 percent of the Oskaloosa Center's sales, and that such a move could be adverse to the corporation. *Id.*, ¶ 136. Donohue's assumption that PFS was large enough to withstand such a loss in sales does not change the fact Donohue knew Raduechel's and Spain's conduct could hurt the corporation. In fact, such a conclusion is consistent with Donohue's office notes: "If done suddenly can PFS get someone to run business opportunity[?];" Plaintiffs' App. at 231; "Pilgrim will come hard to protect investment—Anticipate immediate legal action." *Id.* at 234.

■ Perhaps most importantly, a fact issue exists as to whether Donohue also knew Raduechel and Spain were building their business plan around confidential PFS data. The evidence shows Donohue raised concerns that material he received from Raduchel should not have been left in his possession. Plaintiffs' Statement, ¶ 143, and Donohue's response thereto.

His office notes reflect similar concerns: "Problem with releasing ConAgra info on which these amounts [i.e. financial projections] are based upon;" "Use of ConAgra divisional info a problem w/confidentiality of ConAgra who has not authorized its release to anyone;" "Projections based upon same customers over many years of history . . . ." *Id.*, ¶ 157. A jury must determine whether Donohue's belief that legal counsel was addressing the confidentiality issue is sufficient to absolve him of liability, or whether his continuing review of and assistance with the business plan subjects him to liability for civil conspiracy. Donohue and TD & T's motion for summary judgment is denied with regard to count III. Plaintiffs' motion for summary judgment as against Donohue on this count also is denied.

**E. Constructive Trust and Unjust Enrichment**

Count IV of the second amended complaint sets forth a claim against all defendants for unjust enrichment, and seeks the imposition of a constructive trust "upon monies received by defendants directly or indirectly through the wrongful actions, including all of the revenues of D & B Solutions." Second Amended Complaint, ¶¶ 120–23. Pothoven, Donohue and TD & T seek summary judgment in their favor on this count, with plaintiffs cross-moving for summary judgment in their favor as against the bank defendants only.

**1. Pothoven, Donohue and TD & T**

■ Initially, the Court notes that although plaintiffs have pled this count against all defendants, plaintiffs' evidence and argument on this count are directed exclusively toward the bank defendants (other than Pothoven).[11] The record is

---

11. Plaintiffs seek partial summary judgment on this count against the bank defendants

only. Accordingly, it is unclear whether plaintiffs wish to pursue this count against

devoid of evidence that Pothoven profited personally from his involvement in the formation of D & B Solutions. Accordingly, Pothoven's motion for summary judgment is granted with regard to count IV. Similarly, although Raduechel and/or Spain paid Donohue and TD & T an hourly consulting fee for their services, it does not follow that this money was paid "at the expense of another" or without just compensation. *Credit Bureau Enterprises, Inc. v. Pelo,* 608 N.W.2d 20, 25 (Iowa 2000). As addressed throughout the body of this Order, plaintiffs retain legal remedies against Donohue and TD & T that, if successful, adequately will compensate them for any wrongs committed.[12] Donohue and TD & T's motion for summary judgment is granted with regard to count IV.

### 2. The Bank Defendants

Plaintiffs make their strongest claim for unjust enrichment against the bank defendants.[13] Specifically, plaintiffs point to evidence that MidWest*One* took control of D & B Solutions' receivables following this Court's entry of its preliminary injunction order. Plaintiffs' Statement, ¶ 199. According to Hicks' deposition testimony, there were no outstanding balances on the revolving line of credit MidWest*One* had issued to D & B Solutions, and the $40,000 term note was repaid through the bank's collection of D & B Solutions' receivables. *Id.* Plaintiffs claim the Bank defendants were unjustly enriched through their collection of the receivables, and that the monies rightly belong to plaintiffs.[14]

 To establish a claim for unjust enrichment under Iowa law, one must show: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State, Dept. of Human Servs. ex rel Palmer v. Unisys Corp.,* 637 N.W.2d 142, 155 (Iowa 2001). In the present case, the undisputed facts show that MidWest*One* received the full benefit of its loan to Raduechel and Spain by assuming control over D & B Solutions' receivables. Plaintiffs' Statement, ¶ 199. Material issues of fact remain, however, as to the second and third elements. Although plaintiffs' have established several of their claims against Raduechel and Spain as a matter of law, the type of recovery warranted, and significantly, whether plaintiffs have priority

Raduechel and/or Spain. In view of evidence that the Bank assumed control over all D & B Solutions' receivables, it is difficult to determine whether Raduechel or Spain was in fact "unjustly enriched" by his conduct. Plaintiffs are directed to clarify this issue in their pretrial submissions.

**12.** Although the adequacy of a legal remedy is not a *per se* bar to recovery under an unjust enrichment theory, it is viewed as "a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity." *State, Dept. of Human Servs. ex rel Palmer v. Unisys Corp.,* 637 N.W.2d 142, 155 n. 2 (Iowa 2001).

**13.** The Court notes there is no evidence against Hicks personally on this count. Be-

cause the parties have not attempted to separate Hicks from the Bank in their summary judgment filings, however, the Court does not believe it appropriate to grant summary judgment in Hicks' favor at this time. The Court urges plaintiffs to voluntarily dismiss this count as against Hicks prior to trial, or risk entry of judgment as a matter of law prior to jury submission.

**14.** In fact, the Bank may have collected more than the amount of the outstanding loan balance. As of July 20, 2004, Raduechel estimated that D & B Solutions' accounts receivable exceeded its accounts payable by approximately $100,000. *PFS Distribution Co.,* 332 F.Supp.2d at 1243.

over other creditors, has yet to be established.

Plaintiffs also seek imposition of a constructive trust "upon monies received by defendants directly or indirectly through the wrongful actions, including all of the revenues of D & B Solutions." Second Amended Complaint, ¶ 123. In view of the Court's denial of summary judgment as to plaintiffs' claim of unjust enrichment, however, coupled with the lack of evidence that defendants have attempted to hide and/or destroy assets, the Court declines to impose such a trust at this time. Plaintiffs' motion for summary judgment is denied on count IV with regard to the bank defendants.

### F. Misappropriation of Trade Secrets [15]

Count VI of the second amended complaint alleges all defendants misappropriated PFS trade secrets, and benefited from that misappropriation, in violation of the Iowa Trade Secrets Act, Iowa Code §§ 550.1 *et seq.* Second Amended Complaint, ¶¶ 129–34. Donohue, TD & T, Pothoven and the Bank defendants have moved for partial summary judgment with respect to this count. Raduechel and Spain have joined in the Bank defendants' motion. Plaintiffs have cross-moved for summary judgment as to all defendants other than Pothoven.

 To establish a claim for misappropriation of a trade secret, plaintiffs must prove: 1) the existence of a trade secret, 2) that the secret was obtained as a result of a confidential relationship, and 3) that defendant used the secret in an unauthorized manner. *Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997).

#### 1. Pothoven

Based on the Court's discussion in part II(D) above, plaintiffs have failed to generate a material issue of fact as to whether Pothoven received and/or was privy to a trade secret belonging to plaintiffs. Pothoven's motion for summary judgment is therefore granted with regard to count VI.

#### 2. The Remaining Bank Defendants, Raduechel and Spain

Plaintiffs urge the Court to grant summary judgment against the remaining defendants on this count based on its findings in the preliminary injunction order. Specifically, the Court concluded:

> In the present case, Raduechel admitted that only he, Spain and Lisa Gunsolley had access to weekly profit and loss reports, *see* Plaintiffs' App. Exh. B, Raduechel Dep. at 73. Such information, if known, could allow competitors to undercut PFS' prices and steal accounts. *See* Hearing Tr. at 447–48 (Gunsolley testimony). The same is true of information concerning product mixes and market share. *Id.* The Court therefore has little trouble concluding that plaintiffs are likely to establish the first element with regard to the documents given to consultant Donohue, banker Hicks, and possibly, retained in some form by defendants on their current database. *See gen.* Plaintiffs' App. J, Hearing Exh. 16 at TD & T 124–138.
>
> The remaining two elements, whether the secrets were obtained as the result of a confidential relationship, and unauthorized use of the secrets, previously have been addressed with regard to

---

**15.** Count V of plaintiffs' second amended complaint sets forth a cause of action for copyright infringement against Raduechel, Spain and D & B Solutions. *Id.,* ¶¶ 124–28. Plaintiffs have not moved for summary judgment on this count, and are directed to clarify their intentions as to this count in their pretrial submissions.

plaintiffs' claim for breach of fiduciary duty. Clearly, Raduechel's and Spain's divulgence of these financial and customer documents with Donohue and the bankers, as well as defendants' possible use of the secrets in their current operations, amounts to an unauthorized use of trade secrets.

In resisting plaintiffs' motion on this issue, defendants contend there is no proof anyone other than consultant Donohue saw the information at issue. *See* Hearing Tr. at 135 (Raduechel testimony indicating he complied with Donohue's direction not to share information with anyone else). As argued by plaintiffs in their closing memorandum, however, a reasonable jury could infer that bankers Hicks and Pothoven saw or were informed of the relevant financial information, based on Hicks' deposition testimony that the financial figures and projections contained in the business plan were critical to the banks' decision to make the loan. Plaintiffs' App. Exh. E, Hicks Dep. at 13, 35–36.

*PFS Distribution Co.,* 332 F.Supp.2d at 1250.

█ Raduechel and Spain have failed to produce any new evidence to generate a material issue of fact as to whether they used confidential PFS Oskaloosa information in an unauthorized manner to obtain their loan for D & B Solutions. The fact PFS published its annual sales volume on its website does not prevent plaintiffs from claiming the other data used by Raduechel and Spain, such as COGS, gross profit margin or customer-specific sales figures, are in fact trade secrets. Plaintiffs' motion for summary judgment is granted on count VI as to Raduechel and Spain.

█ Discovery conducted subsequent to the preliminary injunction hearing, however, has generated new-albeit relatively weak evidence as to whether the Bank defendants knew that the data Raduechel and Spain incorporated into their business plan was based on actual PFS information. Since the bank defendants did not acquire the alleged trade secrets directly from plaintiffs, but rather, from Raduechel and Spain, whether the bank defendants knew they were viewing proprietary information is critical to plaintiffs' claim against them. *See Iowa Code* § 550.2(3)(a) (defining misappropriation as the "[a]cquisition of a trade secret by a person who knows that the trade secret is acquired by improper means"); *Id.* § 550.2(3)(b)-(f) (indicating misappropriation may occur if secret is disclosed or used by someone who *knows* the secret was acquired by improper means, or by an individual who owed a duty to maintain the secret's confidentiality).

For example, plaintiffs make much of the fact that one version of the business plan prepared by plaintiffs stated that: "Sales dollars are based on actual sales of Professional Food Systems (PFS) over the last two years." Plaintiffs' App. at 361. It is not clear, however, whether this particular version of the business plan was shown to Hicks, who maintains the two men never told him the data used in the business plan was actual PFS Oskaloosa data. Bank Defendants' App. at 5, 11. Whether Hicks *should* have realized the information was proprietary, based on his personal knowledge of Raduechel's and Spain's employment histories, is for a jury to determine.

Plaintiffs also point out that the "Loan Presentation Summary" prepared by Hicks refers to "cash flow estimates" based on the sales volume of the center's "top two customers," as well as a cost of goods sold ("COGS") figure estimated to be [redacted]. Plaintiffs' App. at 563. Again, however, the fact the Summary refers to "estimates" sheds doubt on whether

Hicks knew or had reason to know Raduechel and Spain were using actual PFS data.

The Bank defendants also note that actual PFS Oskaloosa data for fiscal year 2003 varies from the figures used by Raduechel and Spain in their business plan. *See* Bank Defendants' Statement of Undisputed Facts ("Bank Defendants' Statement"), ¶ 36. Plaintiffs suggest these variances arose in part from differing accounting methods used by TD & T and plaintiffs. Nevertheless, it is for the factfinder-not the Court-to interpret these variances, and to determine whether sufficient evidence exists to conclude the Bank defendants knowingly used PFS trade secrets to evaluate their loan to D & B Solutions. Plaintiffs' motion for summary judgment is denied on count VI as against MidWest*One* and Hicks. The Bank defendants' motion for summary judgment on this count also is denied.[16]

### 3. Donohue and TD & T

As outlined above, there is no dispute that Raduechel and Spain provided Donohue with confidential PFS Oskaloosa information. Plaintiffs' Statement, ¶ 143. Donohue contends, however, that 1) he did not know Raduechel was in fact unauthorized to use the information, and urged him to seek legal counsel; and 2) he did not prepare the business plan himself, and thus did not "use" PFS trade secrets under the meaning of the Iowa Trade Secrets Act.[17]

With regard to Donohue's first argument, the Court previously has found a fact issue as to whether Donohue knew Raduechel and Spain were building their business plan around confidential PFS data. Fact issues also exist as to whether Donohue's role in the preparation of the business plan was sufficient to find that he "used" PFS trade secrets.

The evidence shows that Donohue met with Raduechel and Spain on four occasions in February, and that on each occasion, they brought with them a new draft of the business plan for his review. *See* Donohue's and TD & T's Statement of Undisputed Facts ("Donohue's Statement"), ¶ 35. Donohue did not generate any documents for Raduechel and Spain. *Id.,* ¶ 43. According to Donohue, his "main focus was on the numbers, the projections, and stuff, looking at those." Plaintiffs' App. at 543. Donohue further claims he had no expectation of continued

---

**16.** The Bank defendants argue alternatively that they *could* have obtained PFS Oskaloosa revenue information from the "sweep account" the Oskaloosa center maintained with the Bank. They then cite to numerous cases holding that a bank does not violate a duty to one customer when it uses that customer's deposit information in evaluating a loan to another customer. *See* Bank Defendants' Memorandum in Support of Motion for Partial Summary Judgment at 13–14. The Court is less persuaded by this argument. First of all, there is no evidence PFS Oskaloosa deposited checks in the sweep account on a consistent basis. The bank defendants' own account of PFS Oskaloosa's business practices indicate they may have periodically forwarded checks directly to the main corporate bank. Bank Defendants Statement, ¶ 25.

Secondly, even assuming all checks received by PFS Oskaloosa were deposited directly into the sweep account, the deposit information in and of itself would not reveal profit or loss information. Perhaps most importantly, however, Hicks testified in his second deposition that the Bank maintains strict confidentiality with regard to all customer accounts. *See* Plaintiffs' Consolidated App. at 472–74. Accordingly, even if the Bank had the ability to extrapolate the needed data from PFS Oskaloosa's sweep account, bank policy would have prevented it from doing so.

**17.** Donohue also contends the information used by Raduechel and Spain was publicly available on PFS' website. The Court rejected this argument, above.

work with Raduechel and Spain after the business plan was completed, negating any suggestion that he hoped to profit from the allegedly secret data. Donohue Statement, ¶ 20.

In contrast, plaintiffs note that Donohue spent approximately 10 hours working on the D & B Solutions matter in February alone. *See* Plaintiffs' Consolidated App. at 542, 562–63. They also point to Donohue's handwritten notes on the matter, many addressing potential risks facing D & B Solutions once it began operations. Plaintiffs' Consolidated App. at 159–74.

■ It is for a jury to determine whether Donohue was so intimately involved in the development of the business plan that he himself could be viewed as "using" the allegedly secret information. Plaintiffs' motion for summary judgment is denied with regard to Donohue and TD & T as to count VI. Donohue and TD & T's motion also is denied as to count VI.

### G. Aiding and Abetting

Count VII of plaintiffs' second amended complaint alleges all defendants aided and abetted Raduechel's and Spain's breach of their fiduciary duties to PFS Oskaloosa. Second Amended Complaint, ¶¶ 135–141.

■ To establish a civil claim for aiding and abetting under Iowa law, plaintiffs must prove: 1) a wrong to the primary party; 2) knowledge of the wrong on the part of the aider; and 3) substantial assistance by the aider in the achievement of the primary violation. *Ezzone*, 525 N.W.2d at 398 (citing *Tubbs v. United Central Bank, N.A.*, 451 N.W.2d 177, 182 (Iowa 1990)).

The Court previously has found a lack of evidence to support plaintiffs' claim that Pothoven personally received confidential information, and/or knowingly assisted Raduechel and Spain in their efforts to harm plaintiffs. Pothoven's motion for summary judgment is granted with regard to count VII.

■ The Court has found material issues of fact as to whether the remaining bank defendants, Donohue and/or TD & T knew the financial information supplied to them was proprietary and that Raduechel's and Spain's conduct in attempting to form D & B Solutions amounted to a breach of their duties to PFS Oskaloosa. *See Ezzone*, 525 N.W.2d at 398 ("knowledge of the wrong on the part of the aider" is a necessary element of aiding and abetting claim). It also has found material fact issues with regard to the degree of assistance that Donohue and TD & T gave to Raduechel and Spain in developing their business plan. *See id.* (aiding and abetting claim also requires "substantial" assistance by the aider in accomplishing alleged wrongdoing). In view of the multiple fact issues on two of the three elements of plaintiffs' claim, the Court finds plaintiffs' motion for summary judgment on count VII is denied with regard to Midwest*One*, Hicks, Donohue and TD & T. Donohue and TD & T's motion as to this count also is denied.

### H. Proximate Cause

Lastly, plaintiffs urge the Court to grant summary judgment as to proximate cause on their claims for breach of fiduciary duty, trade secret misappropriation, civil conspiracy, aiding and abetting and unjust enrichment. Specifically, plaintiffs urge the Court to adopt as a matter of law the following propositions: 1) that plaintiffs lost employees solely because of Raduechel's and Spain's "pre-resignation solicitation;" 2) that plaintiffs lost customers because of Raduechel's and Spain's wrongdoings; 3) that the Bank would not have provided financing without the business plan that Donohue and TD & T helped

Raduechel and Spain prepare; and 4) that "the Bank defendants' financing was the enabling event that caused plaintiffs' injuries...." Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment at 11.

Having found material issues of fact to exist on a number of plaintiffs' claims, the Court declines to accept plaintiffs' blanket propositions. In view of the unease felt by Raduechel, Spain and other Oskaloosa center employees after PFS' acquisition of ConAgra, it is quite possible some employees would have chosen to leave the center regardless of D & B Solutions. Secondly, although Fareway Stores and Affiliated Foods may not have left the Center in the short-run without the prospect of buying from D & B Solutions, it is always good business to consider purchasing directly from the producer, rather than through a distributor such as PFS Oskaloosa.

As for plaintiffs' contention that the Bank would not have financed D & B Solutions without the business plan that Donohue and TD & T helped Raduechel and Spain prepare, the Court notes that Pothoven recommended several other accountants and related professionals who could have helped Raduechel and Spain. Whether, at the outset, these individuals would have insisted that Raduechel and Spain develop non-proprietary data to support their plan is impossible to predict.

It is equally uncertain that Raduechel and Spain would have abandoned their plans if MidWest*One* had not issued them credit. Although Raduechel's e-mails to family members suggest their plans to form the new venture were on hold pending the Bank's decision on their loan, there is no evidence to suggest the two men would not have sought financing through another source if turned down by the Mid-West*One*. In short, plaintiffs' suggestion

that the Court overlook the role of the jury as to proximate cause is both unsupported and presumptuous. Plaintiffs' motion for summary judgment on this issue is denied.

## III. CONCLUSION

For the reasons outlined above, defendant John Pothoven's motion for summary judgment is granted in its entirety. Defendant Pothoven is dismissed as a defendant in the action. The Bank defendants' motion for partial summary judgment is denied in its entirety. Donohue and TD & T's motion for summary judgment is denied with regard to counts III, VI and VII and granted with regard to count IV. Plaintiffs' motion for partial summary judgment is granted with regard to liability on counts I and II, and with regard to the liability of Raduechel and Spain on count VI. Plaintiffs' motion is denied in all other respects.

IT IS ORDERED.